(No. 68367.—

ROBERT LOITZ, Appellee, v. REMINGTON ARMS
COMPANY, INC., Appellant.

*Opinion filed September 19, 1990.—Modified on denial of
rehearing November 30, 1990.*

CLARK, J., joined by WARD and CALVO, JJ., dissenting.

William E. Kelly and Charles E. Joern, Jr., of Pope, Ballard, Shepard & Fowle, Ltd., of Chicago, and Nicholas J. Neiers, of Samuels, Miller, Schroeder, Jackson & Sly, of Decatur, for appellant.

Hull, Campbell & Robinson, of Decatur (Jon D. Robinson, of counsel), for appellee.

Richard H. Hoffman, Victor J. Piekarski and Michael Resis, of Querrey & Harrow, Ltd., of Chicago, for *amicus curiae* Illinois Association of Defense Trial Counsel.

Mark I. Levy and Lynn D. Thesing, of Mayer, Brown & Platt, of Chicago, for *amicus curiae* Product Liability Advisory Council, Inc.

Robert N. Wadington, of Cooney & Conway, of Chicago, and Charles A. Porretta, law student, for *amicus curiae* Illinois Trial Lawyers Association.

JUSTICE MILLER delivered the opinion of the court:

The plaintiff, Robert Loitz, was injured when the barrel of the shotgun he was using exploded. Loitz brought the present action against the manufacturer of the gun, Remington Arms Company, Inc. Following a jury trial in the circuit court of Douglas County, Loitz was awarded $75,000 in compensatory damages and $1.6 million in punitive damages. The appellate court affirmed the circuit

court judgment. (177 Ill. App. 3d 1034.) We allowed Remington's petition for leave to appeal (107 Ill. 2d R. 315(a)).

The plaintiff's accident occurred on June 19, 1983. Loitz was participating that day in a trapshooting meet at a gun club near Newman, Illinois. During the competition, the barrel of Loitz's shotgun exploded, and Loitz sustained injuries to his left hand and thumb as a result. Loitz, in his subsequent action against Remington, charged the gunmaker with both negligence and willful and wanton misconduct and requested awards of compensatory and punitive damages. Summary judgment was later entered in Remington's favor on an additional count of the complaint, sounding in strict liability, because that claim was barred by the applicable period of limitations (see Ill. Rev. Stat. 1985, ch. 110, par. 13—213).

The evidence presented at trial is thoroughly summarized in the appellate court opinion and will be restated here only to the extent necessary. At the time of the occurrence Loitz was using a Remington Model 1100 12-gauge shotgun. The Model 1100 is a semiautomatic, gas-operated shotgun and is intended for both target shooting and hunting game. Remington introduced the Model 1100 to the market in 1963, and the gun has been in production since that time; more than 3 million barrels have been sold. The plaintiff's own Model 1100 shotgun was manufactured by Remington in 1972. Loitz bought the gun secondhand later that year and used it without incident until the occurrence here. Loitz, an experienced marksman, was taking part in a trapshooting competition when he was injured; the barrel explosion occurred after Loitz had fired more than 60 rounds. Following the accident Loitz underwent reconstructive surgery on his left hand, and his recovery has been virtually

complete. He incurred special damages of about $5,000 in medical expenses and lost time from work.

The shells being used by Loitz on the day of the accident were ones that he previously had reloaded himself. Reloaded shells are less expensive than factory-made ammunition and are commonly used by competitive shooters. Home production of shells is performed on a reloading machine. A shotgun shell consists of a casing, primer, gunpowder, a wad, and shot, and, on the multistage device used by Loitz, a different component is added at each successive station on the machine. At trial, the parties agreed that mistakes can be made in the operation of the reloading machine. The parties disputed, however, the likelihood of producing, and not detecting, an overloaded shell, particularly one with more than twice the normal charge of gunpowder. The plaintiff's unused shells were recovered from the scene and tested. At trial the parties stipulated that the unused shells were not overloaded and, if fired, would produce pressures within normal limits.

The central issue at trial was the safety and suitability of the metal used in the plaintiff's Model 1100 shotgun barrel, and each side presented its own theory of the cause of the accident. The barrel of the Model 1100 is made from a type of steel known as American Iron and Steel Institute (AISI) 1140 modified. AISI 1140 modified contains manganese sulfide and is described as a free-machining steel, which means that it can be worked more easily than steel that does not share that characterization. In the manufacturing process used by Remington, each shotgun barrel begins as a slug of steel and is forged and worked until a barrel is produced. After the gun is fully assembled, it is subjected to proof-testing. In that procedure, a single round capable of producing higher-than-normal pressure is fired from the gun. Afterwards, the gun is inspected visually for signs

of damage, and several normal rounds are later discharged. From the evidence presented at trial, it appears that normal shotgun shells would produce pressures in a range between 8,000 and 12,000 pounds per square inch. The proof-test shells used by Remington produce pressures ranging between 18,000 and 22,000 pounds per square inch. Remington believed that the plaintiff's gun exploded because it was subjected to a pressure of about 60,000 pounds per square inch.

The plaintiff's expert witness, Dr. David Levinson, a professor of metallurgy at the University of Illinois, Chicago campus, believed that the Loitz gun barrel exploded because of a fatigue failure in response to a normal-pressure shell. In Dr. Levinson's opinion, AISI 1140 modified steel is not a suitable material for use in shotgun barrels. Dr. Levinson stated that the inclusions created by the relatively high sulfur content of that type of steel permit the formation of fatigue cracks, which may eventually cause the barrel to fail under normal pressure loads. Dr. Levinson also believed that Remington had thickened, and therefore strengthened, the barrel of the Model 1100 since the time the plaintiff's particular shotgun was produced. Levinson based that opinion on measurements he obtained from more recently produced Model 1100 shotguns. Disputing that claim, Remington presented testimony indicating that no change had been made in the thickness of the company's Model 1100 barrels. Separately, Levinson noted that a different Remington shotgun, the Model 870, is made of the same steel as the Model 1100 but has a thicker barrel.

Dr. Richard Hertzberg, a professor of metallurgy at Lehigh University, testified in Remington's behalf at trial. Dr. Hertzberg believed that the cause of the shotgun barrel explosion was a high-pressure shell. Dr. Hertzberg based his conclusion on an examination of the plaintiff's gun, on a comparison of the Loitz gun with

exemplar guns that had been intentionally exploded by the discharge of overloaded shells, and on his own tests of the strength of AISI 1140 modified steel. From those tests, Dr. Hertzberg concluded that the type of steel used by Remington for production of the plaintiff's gun barrel was a safe and suitable material for the purpose it was designed to serve and for the range of pressures to which it would normally be exposed. Hertzberg was not aware until trial, however, that a Remington barrel had failed during proof-testing, and he said that he was unable to account for that occurrence. Remington also presented evidence that shotgun barrels can rupture or explode for a number of reasons unrelated to their design or material composition. For example, a barrel might explode if it is obstructed with mud or ice. Also, in what is known as a "12-20 burst," a barrel might explode if a 12-gauge shell and a 20-gauge shell are discharged simultaneously, as when an unfired 20-gauge shell has inadvertently been left in the barrel. Remington witnesses testified that the sulfur content of the steel used by the company helps prevent fragmentation if a barrel does explode.

The parties stipulated that by the time of the plaintiff's accident, in June 1983, Remington had received notice of 94 other barrel explosions involving Model 1100 shotguns and resulting in personal injuries. In 89 of the cases, the persons involved claimed to have been using normal reloaded shells, while in the remaining five cases, the persons said they had used factory-made ammunition. In each of the 94 cases, however, Remington believed that the explosion was caused by the use of a high-pressure shell. In addition, there was testimony indicating that in 1979 Remington had received reports of more than 100 barrel explosions occurring that year that did not result in personal injuries. These additional inci-

dents may have been caused by obstructions in the gun barrel or by the simultaneous discharge of two shells.

Over Remington's objection, the plaintiff was permitted to present testimony by three other persons who had sustained personal injuries when the barrels of their Model 1100 shotguns exploded. The three accidents were among the 94 reported incidents mentioned above. The trial judge admitted the evidence only in relation to the plaintiff's claim for punitive damages and gave the jury limiting instructions to that effect. The three witnesses—Nicholas King, Terry Glover, and Delores Moore—described their accidents and their injuries. King said that he was using a reloaded shell when his gun exploded, but Glover and Moore testified that they were using factory-made shells. Also with respect to the plaintiff's claim for punitive damages, the parties stipulated that Remington had a net worth of $162,314,000 on March 31, 1987, several months preceding the June 1987 trial of the matter.

Remington also presented evidence concerning its manufacture of the Model 1100 shotgun, as well as information regarding its use by the military. In addition, Remington presented testimony of a former executive of the company that had manufactured the reloading device used by the plaintiff. The witness described the machine and demonstrated its operation. Using the machine, he was able to produce some overloaded shells, but he was unable to make one shell that Remington suggested could have been the cause of the present accident.

At the close of evidence the jury returned a verdict in favor of the plaintiff and awarded him $75,000 in compensatory damages and $1.6 million in punitive damages. Judgment was entered on the verdict. On Remington's appeal, the appellate court rejected the company's various claims of error and affirmed both the compensatory and punitive awards. (177 Ill. App. 3d 1034.) The appel-

late court acknowledged that the amount of punitive damages awarded by the jury was large but concluded nonetheless that the case was an appropriate one for imposition of such damages and that the award was not excessive. The appellate court also rejected the defendant's alternative requests for a new trial on both the negligence and willful and wanton misconduct counts, for judgment notwithstanding the verdict on the willful and .wanton misconduct count, and for remittitur on the damage awards. We granted Remington's petition for leave to appeal from the appellate court judgment (107 Ill. 2d R. 315(a)). The Illinois Association of Defense Trial Counsel, the Illinois Trial Lawyers Association, and the Product Liability Advisory Council, Inc., have been permitted to submit briefs as *amici curiae* (107 Ill. 2d R. 345).

The principal issue in the present appeal concerns the imposition of $1.6 million in punitive damages, and Remington raises a number of challenges to the award. Remington contends that the evidence in the present case does not warrant imposition of punitive damages, that the jury's verdict was the result of trial error, and that the sum awarded is excessive and should be reduced to an appropriate amount through remittitur. Remington also argued in the courts below that large awards of punitive damages between private parties may be an excessive fine in violation of the eighth amendment of the Federal Constitution. Acknowledging that the same contention has since been rejected by the United States Supreme Court (see *Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.* (1989), 492 U.S. 257, 106 L. Ed. 2d 219, 109 S. Ct. 2909), Remington now presents as an alternative constitutional claim the argument that large punitive damage awards may violate due process.

Although the evidence in the case at bar was sufficient to sustain a finding of negligence on Remington's part—and we note that Remington requests only a new trial, and not judgment notwithstanding the verdict, on the plaintiff's negligence claim for compensatory damages—we do not believe that there was sufficient evidence of misconduct on Remington's part to warrant submission of the plaintiff's claim for punitive damages to the jury. Accordingly, we reverse the punitive damage award.

I

Punitive, or exemplary, damages are not awarded as compensation, but serve instead to punish the offender and to deter that party and others from committing similar acts of wrongdoing in the future. (*Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 350, 41 L. Ed. 2d 789, 811, 94 S. Ct. 2997, 3012; *Mattyasovszky v. West Towns Bus Co.* (1975), 61 Ill. 2d 31, 35; Restatement (Second) of Torts §908(1) & comment *a*, at 464 (1979); Owen, *Problems in Assessing Punitive Damages Against Manufacturers of Defective Products*, 49 U. Chi. L. Rev. 1, 7-8 (1982).) Because of their penal nature, punitive damages are not favored in the law. (*Deal v. Byford* (1989), 127 Ill. 2d 192, 203; *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 188; *Cornell v. Langland* (1982), 109 Ill. App. 3d 472, 474-75.) Appropriately enough, the initial decision whether punitive damages may be imposed in a particular case in this State is a matter normally reserved to the trial judge. *J.I. Case Co. v. McCartin-McAuliffe Plumbing & Heating, Inc.* (1987), 118 Ill. 2d 447, 453; *Hammond v. North American Asbestos Corp.* (1983), 97 Ill. 2d 195, 211; *Eshelman v. Rawalt* (1921), 298 Ill. 192, 197-98; *cf.* Ill. Rev. Stat. 1987, ch. 110, par. 2—604.1 (in certain tort actions, party seeking punitive damage award must establish at pretrial hearing "a rea-

sonable likelihood of proving facts at trial sufficient to support an award of punitive damages").

Describing the circumstances in which an award of punitive damages is appropriate, this court in *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 186, stated:

> "It has long been established in this State that punitive or exemplary damages may be awarded when torts are committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others (*Consolidated Coal Co. v. Haenni* (1893), 146 Ill. 614). Where punitive damages may be assessed, they are allowed in the nature of punishment and as a warning and example to deter the defendant and others from committing like offenses in the future. (*Eshelman v. Rawalt* (1921), 298 Ill. 192, 197.)"

See also Restatement (Second) of Torts §908(2) (1979) ("Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others").

The present action was submitted to the jury on allegations of both negligence and willful and wanton misconduct. It must be recognized, however, that "[n]egligence is not the same as wantonness" (*Quad County Distributing Co. v. Burroughs Corp.* (1979), 68 Ill. App. 3d 163, 166), and that "[p]unitive damages are not awarded for mere inadvertence, mistake, errors of judgment and the like, which constitute ordinary negligence" (Restatement (Second) of Torts §908, comment *b*, at 465 (1979)). "Since the purpose of punitive damages is not compensation of the plaintiff but punishment of the defendant and deterrence, these damages can be awarded only for conduct for which this remedy is appropriate—which is to say, conduct involving some element of outrage similar to that usually found in crime. The conduct must be outrageous, either because the

defendant's acts are done with an evil motive or because they are done with reckless indifference to the rights of others." (Restatement (Second) of Torts §908, comment *b*, at 464-65 (1979).) In this context, willful and wanton misconduct " 'approaches the degree of moral blame attached to intentional harm, since the defendant deliberately inflicts a highly unreasonable risk of harm upon others in conscious disregard of it.' " *Bresland v. Ideal Roller & Graphics Co.* (1986), 150 Ill. App. 3d 445, 457.

As punitive damage awards have increased in recent years in both frequency and amount, the problems posed by such awards have attracted greater attention. (See generally Jeffries, *A Comment on the Constitutionality of Punitive Damages*, 72 Va. L. Rev. 139 (1986); Owen, *Problems in Assessing Punitive Damages Against Manufacturers of Defective Products*, 49 U. Chi. L. Rev. 1 (1982); Owen, *Punitive Damages in Products Liability Litigation*, 74 Mich. L. Rev. 1257 (1976); Wheeler, *The Constitutional Case for Reforming Punitive Damages Procedures*, 69 Va. L. Rev. 269 (1983).) Because punitive damages serve a penal purpose and are awarded not as compensation, but for reasons of retribution and deterrence, the amount of such an award is determined by more than just a consideration of the nature and extent of the claimant's loss. The broad range of circumstances that may be taken into account by a jury in making a punitive damage award often invites imposition of a large sum unrelated to the injury incurred. (See *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 350, 41 L. Ed. 2d 789, 811, 94 S. Ct. 2997, 3012 ("In most jurisdictions jury discretion over the amounts awarded is limited only by the gentle rule that they not be excessive. Consequently, juries assess punitive damages in wholly unpredictable amounts bearing no necessary relation to the actual harm caused").) Moreover, concern has been

expressed regarding the threat of multiple recoveries in mass tort cases. (*Roginsky v. Richardson-Merrell, Inc.* (2d Cir. 1967), 378 F.2d 832, 839-41.) Threatened with liability for large punitive damage awards, product manufacturers may curtail their research and development of new and beneficial products. *Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.* (1989), 492 U.S. 257, 282, 106 L. Ed. 2d 219, 242-43, 109 S. Ct. 2909, 2924 (O'Connor, J., concurring in part and dissenting in part).

In Illinois, the General Assembly has addressed a number of concerns relating to punitive damage awards. For example, punitive damages may not be recovered in cases of medical or legal malpractice. (Ill. Rev. Stat. 1987, ch. 110, par. 2—1115.) For causes of action accruing on or after November 25, 1986, complaints alleging negligence and involving personal injury or property damage and complaints in products liability actions based on strict liability may not contain a prayer for relief seeking an award of punitive damages; in those specified cases a request for punitive damages may be submitted to the jury only after the party seeking the award demonstrates, in a pretrial hearing, that the evidence would warrant such an award. (Ill. Rev. Stat. 1987, ch. 110, par. 2—604.1.) If punitive damages are subsequently awarded, the trial judge may apportion the recovery among the plaintiff's attorney and the Illinois Department of Rehabilitation Services, in addition to the plaintiff. Ill. Rev. Stat. 1987, ch. 110, par. 2—1207.

## II

The plaintiff contends that Remington knew of the defect in the Model 1100 shotgun and the resulting dangerous propensity of the gun. The appellate court agreed with the plaintiff's assessment of the evidence.

In affirming the award of punitive damages in the present case, the appellate court stated that Remington's "failure to warn of a known defect in flagrant disregard of the public safety is the activity which resulted in the punitive damage award." (177 Ill. App. 3d at 1064.) The plaintiff believes that a number of circumstances demonstrate the company's awareness of the defective nature of the firearm. In response, Remington contends that it was punished for failing to provide a warning about a defect that the company, in good faith, did not believe existed. Remington further maintains that there is no evidence that it had any actual knowledge of the claimed defect and insists that the gun barrel was not defective. We have grouped by subject matter the evidence cited by the plaintiff in support of his claim and will discuss those points in turn. Perhaps the most significant evidence in this regard is that concerning the number of prior accidents reported to Remington. Other evidence cited by the plaintiff, however, is ambiguous at best or fails entirely to demonstrate the awareness on Remington's part that plaintiff claims to have existed.

The plaintiff first refers to evidence concerning the notice admittedly received by Remington of prior accidents involving Model 1100 shotguns. The plaintiff observes that Remington had received reports of 94 other barrel explosions involving Model 1100 shotguns prior to the plaintiff's own accident. The plaintiff notes that even though five of the persons involved in those prior accidents claimed to have been using factory-made ammunition at the time, Remington maintained that the causes of the explosions in all 94 cases were high-pressure reloaded shells. According to the plaintiff, Remington invariably proffers that explanation because the company realizes that a factory-produced shell would not cause a gun barrel to explode unless

the barrel were defective in some way. The plaintiff also refers to testimony indicating that Remington received 100 reports in 1979 alone of barrel explosions that did not result in personal injuries. As evidencing Remington's knowledge of the alleged defect, the appellate court in the present case mentioned the "detailed testimony about prior, similar occurrences which were made known to defendant before plaintiff's gun exploded." 177 Ill. App. 3d at 1064.

Remington presented testimony that the company had investigated each of the 94 prior similar occurrences and had concluded in every case that the cause of the accident was a high-pressure shell. Contrary to the plaintiff's view, Remington did not insist that all the shells were reloaded; at trial, Remington employee James Hutton testified that the company had concluded in those instances that the high-pressure shell was either a reloaded shell or a factory-loaded product. Until 1983, a committee consisting of Remington employees performed the investigation of accidents such as those in question; during that year, the duty was assumed by one person. It is not clear from the record precisely what sort of investigation was performed in each case. It appears, however, that many users routinely send their shotguns to the company for purposes of repair work. Remington destroys records of prior accidents and complaints after three years have passed.

Guns are inherently dangerous instrumentalities, and the mere occurrence of other explosions does not, without more, establish outrageous misconduct or some other basis sufficient to warrant the imposition of punitive damages. (*Moore v. Remington Arms Co.* (1981), 100 Ill. App. 3d 1102, 1112.) Discussing the relevance of evidence of prior accidents in the context of a claim for punitive damages, one commentator has stated:

"It is also important to view the number of complaints and lawsuits concerning a product in the context of the total number of products sold and in use, the frequency of the product's use, and the particular product's inherent dangers. Thus, it must be expected that virtually all manufacturers of mass-produced goods that are inherently dangerous—automobiles, tires, drugs, chemicals, or firearms—will be the targets of many complaints and lawsuits every year." Owen, *Problems in Assessing Punitive Damages Against Manufacturers of Defective Products*, 49 U. Chi. L. Rev. 1, 31 (1982).

The 94 prior accidents represent about 0.003% of Remington's production of more than 3 million Model 1100 barrels during the span of time in question. The prior accidents must be considered not only in relation to the number of barrels produced by Remington during that period, but also in relation to the estimated number of times those guns would have been used. Although the latter number cannot be known with any precision, the plaintiff's trial testimony demonstrates that he had used his own Model 1100 shotgun literally thousands of times. Thus, the prior explosions represent a small percentage of Remington's production of gun barrels, and an even smaller percentage of the number of times the shotguns were actually fired.

The plaintiff cites as further evidence of Remington's awareness of the product defect its receipt in 1979 alone of notice concerning some 100 other barrel explosions. But it is not clear in what respect the additional evidence is helpful to the plaintiff's theory in this case. Although there is testimony indicating that the other incidents did not involve personal injury and were not similar to the plaintiff's accident, the record does not clearly demonstrate what the causes of the other explosions were. There was testimony, however, indicating that a shotgun barrel may explode if ob-

structed by mud or ice, or if an extra shell is in the gun when another shell is fired. Moreover, the appearance of a gun following an explosion produced by one of those causes would not necessarily resemble the appearance of a gun that has undergone an explosion produced by a high-pressure shell. As we have stated, there was testimony indicating that the company repairs broken guns for consumers, and the plaintiff is not claiming that every mishap must be attributed to the allegedly defective nature of the Model 1100 shotgun.

The plaintiff also contends that information that was developed in the course of prior litigation supplied Remington with notice of the defect existing in its Model 1100 shotgun barrels. The plaintiff notes that around 1979, several years before the accident involved in this case, Dr. Levinson conveyed to Remington his views concerning the safety and suitability of the company's use of AISI 1140 modified steel. Dr. Levinson appeared as an expert witness on behalf of the plaintiff in *Moore v. Remington*, and his opinion was presented to the company in connection with the earlier litigation. In addition, the plaintiff maintains that the appellate court's decision in *Moore v. Remington*, which affirmed a judgment for compensatory damages premised on a strict liability theory, apprised Remington that the Model 1100 shotgun barrel could be considered defective. The plaintiff alleges the company's inaction in the wake of the earlier decision. In upholding the award of punitive damages in the present case, the appellate court cited as an aggravating circumstance Remington's inaction in the face of the earlier adverse decision in *Moore*. 177 Ill. App. 3d at 1064.

While it is true that Remington was made aware of Dr. Levinson's opinion during the course of the prior case, it cannot be said that Remington was automati-

cally *required to embrace Dr. Levinson's* view as its own. The evidence presented at trial indicated that Remington began producing the Model 1100 shotgun in 1963 following extensive research into its design. Remington employs its own engineers and metallurgists and relies on their expertise. Various tests are performed at different stages of the manufacturing process to ensure the safety and quality of its shotguns. Remington's evidence demonstrated, however, that its manufacturing and testing procedures are not able to prevent every barrel explosion or rupture, given the varying conditions to which the shotguns might be exposed. High-pressure shells, obstructions in the bore, and "12-20 bursts" can all cause shotgun barrels to fail. Having concluded that the cause of the Moore accident was a high-pressure shell, Remington declined to accept Dr. Levinson's contrary theory of the explosion in that case.

Moreover, the plaintiff makes no claim in this negligence action that preclusive effect should be given to the earlier verdict in *Moore* on the strict liability claim asserted there and that Remington is now collaterally estopped from challenging the earlier determination. It should be noted that the plaintiff in that case claimed also to have been using a Remington shell when her Model 1100 shotgun exploded, and she alleged that both Remington products were defective; the general verdict returned by the jury did not specify the basis for its finding of liability. If the prior litigation is to be accorded relevance, then it must be conceded that Remington could have found equal significance in the *Moore* court's reversal of the punitive award in that case, where the appellate court ruled that punitive damages could not properly be imposed in the circumstances shown there. In like vein, Remington could as well take note of two other tort actions involving

Model 1100 shotguns that have been brought against the company in Illinois. As the company represents, in each case the trial judge directed a verdict in Remington's favor on claims seeking punitive damages, and a jury in one of the cases returned a verdict in Remington's favor on a claim for compensatory damages. In an action brought against Remington in Kentucky, a jury found the company liable for both compensatory and punitive damages.

As further proof that Remington was aware of the defect charged here, the plaintiff contends that the company changed its manufacturing process in 1980 and that the barrels of Model 1100 shotguns produced after that time are thicker than those of shotguns produced before the manufacturing change. Remington acknowledges that in 1980 it made a change with respect to one of the steps in the production of its shotguns, but the company insists that the alteration had no material effect on its product and denies that the thickness of the barrels has changed.

Dr. Levinson, testifying in behalf of the plaintiff, stated that he had measured six or seven different Model 1100 shotguns and had found that the barrel walls of shotguns produced after the 1980 manufacturing change were about 5% thicker than those of guns produced previously. According to Levinson, the former manufacturing process contributed to the problem: Levinson believed that barrels made before the 1980 manufacturing change have larger, longer, and less-well-distributed manganese sulfide inclusions than barrels produced after that time.

At trial, Remington presented evidence contradicting the plaintiff's theory. James Hutton, Remington's senior staff engineer for firearms research and development, testified in detail concerning the different stages of the manufacturing of the Model 1100 shot-

gun. Hutton explained that the manufacturing change cited by the plaintiff involved a preliminary step in the production of the shotgun barrels, and pertained to different methods used to prepare the steel product received from the steelmaker for forging. Hutton stated that until 1980 the company used a Verson extrusion press to produce the pieces that were forged into shotgun barrels. In 1980 the company switched to a technique known as "auto-drilling." Hutton denied that the changeover had any material effect on barrel production. Hutton further stated that a review of Model 1100 parts specifications dating back to 1963 failed to reveal any design changes affecting barrel wall thickness. Hutton also questioned the import of Dr. Levinson's testimony regarding his measurements of at least two of the earlier, Verson-extruded barrels. According to Hutton, repair work on two of the earlier shotguns had reduced slightly the thickness of their barrel walls. Hutton explained that the addition of a part to the barrel area of one of the guns, and certain restoration work on the barrel of another, had resulted in the removal of material from the outer surfaces of those barrels.

The plaintiff offers a final series of items intended to show Remington's awareness of the deficiency of the Model 1100 shotgun. The plaintiff notes the supposed uniqueness of the AISI 1140 modified steel used by Remington and, in addition, cites certain statements made with respect to that material by a Remington employee and by Remington's expert witness in the present litigation. First, the plaintiff contends that the metal used by Remington, AISI 1140 modified, is unique and that no other gun manufacturer uses a similar material. At trial, however, Remington presented evidence that although the metal used by the company is unique, in that it is made to the company's own

specifications, other gun manufacturers also use AISI 1100 series steel. Remington witnesses explained that the ductility of a softer metal may cause an exploding barrel to petal rather than fragment, and that the company added sulfur to the metal to prevent fragmentation in the event of a barrel explosion. As we have seen, barrel accidents can occur for reasons unrelated to the design or composition of the shotgun. The plaintiff's expert, Dr. Levinson, acknowledged that a barrel made of a harder material would be more brittle.

As further evidence of Remington's awareness of the deficiencies of AISI 1140 modified steel, the plaintiff cites certain testimony given on an earlier occasion by Phillip Johnson, Remington's supervisor of chemical and metallurgical control, and introduced into evidence in this case. At the *Moore* trial in 1980, Johnson stated, during examination as an adverse witness, that he was aware that chrome molybdenum steel contains fewer inclusions than the variety of steel used by Remington. Asked whether chrome molybdenum steel was "a better steel than using" AISI 1140 modified, Johnson replied, "Yes, perhaps that's true." The witness did not agree, however, that the presence of inclusions would weaken a gun barrel. At the trial of the present case, the plaintiff introduced Johnson's testimony into evidence upon a showing that the witness was not available. The plaintiff now argues that Johnson's prior testimony reflects the view that Remington was aware of the unsuitable nature of its AISI 1140 modified steel.

While it is true that Johnson may have believed that chrome molybdenum steel was a better material, his testimony does not reflect the judgment that the steel used by Remington was improper. Describing the same testimony, the court in *Moore* stated, "Phillip Johnson's testimony that chrome molybdenum was

probably a better steel than the steel used by Remington establishes neither the unreasonably dangerous or defective nature of the metal used by Remington nor that Remington was aware of the existence of such defect." (100 Ill. App. 3d at 1115.) We agree. That Johnson believed that another variety of steel might be superior does not mean that the type actually used by Remington was inadequate.

As another example of Remington's own criticism of its metal selection, the plaintiff cites statements appearing in Dr. Hertzberg's book, Deformation and Fracture Mechanics of Engineering Materials (2d ed. 1983), to the effect that the presence of sulfur inclusions in steels may weaken the materials. At trial, however, Dr. Hertzberg explained that the statements in his book were true as a general matter but had no application here, because the type of metal used by Remington was in fact able to withstand normal loads of pressure.

Viewing the record in the light most favorable to the plaintiff (see *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510), we do not consider that the evidence described above, or the additional expert testimony presented by the parties, was sufficient to warrant imposition of punitive damages in this case, whether the evidence is assessed under a standard of "flagrant indifference" to public safety (see *Moore*, 100 Ill. App. 3d at 1112-15 (adopting "flagrant indifference" standard for use in awarding punitive damages in products liability cases)), or measured against the more traditional phrasing of willful and wanton misconduct. At trial the parties' expert witnesses disagreed on the safety and suitability of the material used by Remington in the production of its Model 1100 shotgun barrels. Remington acknowledged that it had received reports of prior similar accidents involving the gun but

claimed that the prior explosions were all caused by high-pressure shells, whether reloaded shells or factory-made products. Testimony by witnesses involved in three of the prior cases was not necessarily inconsistent with Remington's theory. The plaintiff did not present any evidence that would cast doubt on Remington's good faith in investigating the prior cases.

We conclude that there was not sufficient proof that Remington had the requisite degree of culpability that would warrant imposition of a sanction that is intended to punish and deter. As we have indicated, evidence of willful and wanton misconduct requires more than proof of mere negligence, and we do not consider that the plaintiff satisfied that burden here. In light of our decision that punitive damages may not be recovered in the present case, we need not consider Remington's remaining contentions challenging the constitutionality of such an award or, alternatively, seeking a new trial on that part of the plaintiff's action or a remittitur of the amount awarded. Taken with the case was the plaintiff's motion to strike certain portions of the *amicus* brief submitted on this issue by the Product Liability Advisory Council, Inc. The challenged portions of the brief do not form the basis for our resolution of the present appeal, and the motion to strike is therefore dismissed as moot.

## III

As a final matter, Remington raises several arguments in support of its request for a new trial of the plaintiff's negligence claim. We find no reversible error here. Remington first assigns as error the introduction of testimony by three witnesses—King, Glover, and Moore—describing their own accidents involving the defendant's Model 1100 shotgun. The three witnesses stated that the shells they were using at the time of

their accidents were normal reloaded or factory products. The witnesses also described the injuries they received as a result of the barrel explosions and recounted their subsequent medical treatment. The appellate court ruled that the testimony detailing the events preceding the accidents was "arguably relevant" to the company's failure to provide warnings of the alleged defect, but the court considered the medical evidence to be of doubtful relevance. (177 Ill. App. 3d at 1062-63.) The jurors were specifically instructed on several occasions to consider the King, Glover, and Moore testimony only in relation to the portion of the plaintiff's action seeking punitive damages, and we consider that the trial judge's admonitions confined to that extent the jury's use of the challenged evidence. Because we have determined that the award of punitive damages must be reversed, we have no occasion to consider here the effect of the testimony on that portion of the judgment.

Remington next contends that the trial judge erred in allowing the plaintiff to introduce evidence that the barrel wall of a different Remington shotgun, the Model 870, was thicker than that of the Model 1100, the shotgun used by Loitz. The barrels of both models are made from the same type of steel, AISI 1140 modified, and it is not disputed that a thicker barrel is stronger. Noting that the feasibility of an alternative design was not at issue in this case, Remington asserts that the evidence regarding the Model 870 shotgun was irrelevant.

Assuming, without deciding, that the evidence of the Model 870 shotgun was not relevant to the present case, we do not believe that its introduction had any prejudicial effect. The jurors heard Remington's explanation that the barrel of the Model 870 was thicker than that of the Model 1100 because the former shot-

gun was originally equipped with a two-piece barrel, and the added thickness accommodated the threads by which the barrel extension was secured.

Remington also complains of the plaintiff's cross-examination of Remington employee James Hutton concerning the company's 1980 product catalogue. The catalogue contained the erroneous statement that the Model 1100 shotgun was made of chrome molybdenum steel. Hutton, in his testimony, acknowledged that the statement appeared in the catalogue; Hutton went on to explain that the statement was not true, and he attributed the mistake to the work of whoever was responsible for preparing the copy for the catalogue. We agree with the appellate court that the relevance of this testimony was "tenuous, at best." (177 Ill. App. 3d at 1046.) There was no claim in the present case that Loitz relied on the 1980 catalogue statement as a representation of the metal composition of his own Model 1100 shotgun, or even that he purchased the gun in 1972 in reliance on a like representation. We do not believe, however, that the evidence of the catalogue misstatement had any effect on the jurors' determination of liability or on their assessment of compensatory damages. As we have noted, Hutton explained that the statement appearing in the catalogue was a mistake. Moreover, Hutton was not the sole source of testimony concerning chrome molybdenum steel, for there was other, competent evidence indicating its desirability.

Remington's final assignment of trial error concerns certain statements made by plaintiff's counsel during the defendant's direct examination of Remington employee James Hennings. On that occasion, plaintiff's counsel declared before the jury that the company had failed to reveal, during discovery, certain information relating to the witness' testimony. Sometime later, out-

side the presence of the jury, defense counsel demonstrated that the information had, in fact, been made available. The trial judge subsequently informed the jury that Remington had produced the required materials, and specifically instructed the jurors "to disregard any references to the contrary." There is no reason to believe here that the admonition was other than sufficient to cure counsel's mistaken remarks.

For the reasons stated, we affirm the award of compensatory damages and reverse the award of punitive damages. Accordingly, the judgment of the appellate court is affirmed in part and reversed in part, and the judgment of the circuit court of Douglas County is affirmed in part and reversed in part.

> *Appellate court affirmed in part*
> *and reversed in part;*
> *circuit court affirmed in part*
> *and reversed in part.*

JUSTICE CLARK, dissenting:

I believe that there was sufficient evidence of Remington's willful and wanton misconduct in this case to support the jury's imposition of punitive damages. Therefore, I respectfully dissent.

Punitive damages may be awarded in Illinois "when torts are committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully or with such gross negligence as to indicate a wanton disregard of the rights of others." (*Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 186.) Willful or wanton misconduct includes acts " 'committed under circumstances exhibiting a reckless disregard for the safety of others, such as a failure, after knowledge of impending danger, to exercise ordinary care to prevent it or a failure to discover the danger through recklessness or carelessness when it could have been discov-

ered by the exercise of ordinary care.' " (*Hering v. Hilton* (1958), 12 Ill. 2d 559, 562 (quoting *Schneiderman v. Interstate Transit Lines, Inc.* (1946), 394 Ill. 569, 583).) The question of whether a defendant's conduct was sufficiently willful or wanton to justify the imposition of punitive damages in a particular case is one for the jury to decide. *Smith v. Hill* (1958), 12 Ill. 2d 588, 595.

It is of course true, as the majority notes, that where, as a matter of law, punitive damages cannot be awarded for a particular type of cause of action, a trial court cannot submit the question of punitive damages to the jury. (See 138 Ill. 2d at 414 (citing *Hammond v. North American Asbestos Corp.* (1983), 97 Ill. 2d 195, 211, and *Eshelman v. Rawalt* (1921), 298 Ill. 192, 197-98).) Similarly, the question of punitive damages cannot be submitted to the jury if the plaintiff fails to introduce evidence of the defendant's willfulness or wantonness. See 138 Ill. 2d at 414-15 (citing *J.I. Case Co. v. McCartin-McAuliffe Plumbing & Heating, Inc.* (1987), 118 Ill. 2d 447, 453).

This court has stated that "[w]hile a trial court's determination [as to punitive damages] is always subject to review, we will not disturb that finding or substitute our own opinion unless it is against the manifest weight of the evidence." (*In re Estate of Wernick* (1989), 127 Ill. 2d 61, 85.) This standard requires that a jury's verdict not be reversed unless there is "evidence which, when viewed most favorably to the party prevailing in the trial court, nevertheless so overwhelmingly favors the [party seeking reversal] that no contrary verdict could stand." *York v. Stiefel* (1983), 99 Ill. 2d 312, 321.

Remington, through a written stipulation that was read to the jury, admitted it knew prior to plaintiff's accident that at least 94 Model 1100 shotgun barrels

had exploded in a manner similar to the explosion in this case. Five of the victims of the explosions claimed to have been using normal, new factory ammunition, while the other 89 victims claimed to have been using normal, reloaded ammunition. The plaintiff had three of these victims testify, two of whom stated that they had been using normal, new factory ammunition.

I believe that this evidence, standing alone, would be sufficient to support the jury's award of punitive damages. The jury could have concluded that Remington acted willfully or wantonly in failing to discover the defect in the gun after 94 complaints (see *Hering*, 12 Ill. 2d at 562; see also *City of Chicago v. Jarvis* (1907), 226 Ill. 614, 617; *Moore v. Jewel Tea Co.* (1969), 116 Ill. App. 2d 109, 129 (evidence of prior accidents and complaints is admissible to establish notice of a defect)), or acted willfully and wantonly in failing to warn plaintiff of the defect in the gun (see *Lipke v. Celotex Corp.* (1987), 153 Ill. App. 3d 498, 505-06). The majority, however, holds that the evidence pertaining to the 94 prior explosions was somehow negated by the fact that Remington had two of its employees testify that the company had investigated all of the prior explosions. (See 138 Ill. 2d at 426-27.) According to these employees, the company concluded in each case that, contrary to the claims of the victims, the explosions had to have been caused by high-pressure shells rather than by defects in the guns. The majority, without citing to the applicable standard for reviewing jury determinations, gives the employees' testimony conclusive effect. In so doing, the majority invades the province of the jury.

It is axiomatic that "[i]t is the function of the jury to assess the credibility of witnesses and the weight to be accorded their testimony ***, and the jury's determination will not be overturned unless contrary to the

manifest weight of the evidence." (*Midland Hotel Corp. v. Reuben H. Donnelley Corp.* (1987), 118 Ill. 2d 306, 312-13.) In this case, there are many reasons it would not have been against the manifest weight of the evidence for the jury to have found the employees' testimony less than credible.

First, both witnesses, as longtime employees of Remington, obviously were biased. Both employees also conceded that the records pertaining to these alleged investigations were not available for trial because they had been destroyed by Remington. Furthermore, neither employee explained what procedures, if any, Remington utilized in undertaking these alleged investigations. Thus, the only pieces of evidence in the case pertaining to the alleged investigations were the unsubstantiated statements by the employees that such investigations did in fact take place. Finally, due to the fact that the jury did not believe Remington's claim that the explosion in this case was caused by a high-pressure shell, the jury may have doubted the veracity and sincerity of Remington's claims concerning the 94 prior cases. Instead, the jury may have believed that even if Remington had investigated each explosion, the investigations were merely done in a perfunctory fashion. Such a belief would have been reinforced by the three victims who testified in this case that, contrary to Remington's claims, they were not using high-pressure ammunition.

In light of these factors, it would not have been against the manifest weight of the evidence for the jury to have disregarded the employees' testimony. Having done so, it would not have been against the manifest weight of the evidence for the jury to have awarded punitive damages based upon Remington's knowledge of the 94 explosions which took place prior to the plaintiff's accident in this case. Under the mani-

fest weight of the evidence standard of review, I would affirm the appellate court's decision which affirmed the jury's award of punitive damages in this case.

JUSTICES WARD and CALVO join in this dissent.