In the

# United States Court of Appeals
### For the Seventh Circuit

---

Nos. 03-2663 and 03-2773

MARSHALL PARKS and CINDY PARKS,

*Plaintiffs-Appellees,*
*Cross-Appellants,*

*v.*

WELLS FARGO HOME MORTGAGE, INC.
f/k/a NORWEST MORTGAGE INC.,

*Defendant-Appellant,*
*Cross-Appellee.*

---

Appeals from the United States District Court
for the Central District of Illinois.
No. 00-CV-1156—**John A. Gorman**, *Magistrate Judge.*

---

ARGUED MAY 21, 2004—DECIDED FEBRUARY 23, 2005

---

Before BAUER, KANNE, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* When Norwest Mortgage, Inc., failed properly to pay two tax installments on property mortgaged by Marshall and Cindy Parks, a bureaucratic snarl ensued. The Parkses, along with Norwest, became enmeshed in a legal fight to avoid losing their home. Although they eventually succeeded in defeating the claim of a tax scavenger who had fraudulently obtained a tax deed on the Parkses' home, the Parkses blamed

Norwest for allowing the situation to get out of hand. They sued Norwest (now part of Wells Fargo Home Mortgage, Inc.) for breach of contract, breach of fiduciary duty, and violation of duties imposed by the Illinois Consumer Fraud Act (CFA), 815 ILCS 505/2, invoking the federal court's diversity jurisdiction. (Norwest was a Minnesota corporation with its principal place of business in that state; Wells Fargo is incorporated in California and has its principal place of business in Iowa; the Parkses, who originally alleged only that they are "residents" of Illinois, have now made it clear on the record that they are citizens of Illinois.) We refer to the defendant-appellant as Norwest, in keeping with the usage in the district court's opinion.

The Parkses prevailed on all points in the district court: a jury found in their favor on their breach of contract and breach of fiduciary duty claims and awarded emotional distress and punitive damages totaling over $3 million; the court found Norwest liable under the CFA and gave the Parkses additional damages as well as attorneys' fees. Norwest appeals, arguing that the breach of contract and fiduciary duty claims cannot support emotional distress and punitive damages. It also contests its liability under the CFA. Although we sympathize with the Parkses' frustration, we conclude that the law is on Norwest's side. We therefore vacate the award of damages for emotional distress and the punitive damages and reverse the district court's finding of liability under the CFA.

# I

The Parkses owned two adjacent properties, each with its own tax identification number. In 1993, the Parkses obtained a mortgage from Norwest on one of the two lots. Illinois law provides for two methods of paying one's property taxes: the property owner may pledge assets

and be responsible for paying taxes herself; or she may set up an escrow account with the mortgagee, who in that case is responsible for paying the taxes out of the escrow account. The Parkses chose to use the second method and had Norwest handle their property taxes.

In 1994, the Parkses combined the two lots. The combined parcel was given a new tax identification number. When the service company Norwest used to administer its property tax obligations paid the taxes for 1994 (the first installment of which was due in May 1995), the company found the new parcel number and paid accordingly. By the time the second installment was due (August 1995), however, Norwest had stopped using that facility. Norwest did not detect the change in tax identification numbers; instead, it erroneously made the payment using the prior, now-invalid number. Because of the error, that tax payment was returned to Norwest. Norwest redeposited the payment into the escrow account and the second payment was never made. Norwest claimed that it sent a letter to the Parkses advising them about the refund and asking for any information about it; the Parkses denied ever receiving any such letter, and apart from a computer log indicating that the letter was sent, no evidence of the letter ever turned up.

In the meantime, because the August 1995 payment was never properly made, the tax authority considered the Parkses' taxes delinquent in that amount. Kathy Artman, an alert tax scavenger, spotted the fact that the county records showed no August 1995 payment for the 1994 taxes. She moved quickly—indeed, as it turned out, too quickly—and purchased the taxes at a December 1995 tax sale. She gave no notice to either the Parkses or to Norwest's local office. It does appear that in February 1996, Artman sent a notice to Norwest's national headquarters, but that notice was never routed to the appropriate office.

After the 1995 glitch, Norwest continued to pay the taxes on the Parkses' property, using the correct tax

identification number from May 1996 through August 1998. The true situation emerged with the second installment of the taxes for 1997, which was due in September 1998. Both Artman and Norwest paid the taxes. Ironically, this seems to have been only the second time Artman had paid taxes on the property. The county received Artman's payment first. When Norwest's payment arrived, it was again returned and credited to the Parkses' escrow account.

The period of redemption associated with the tax sale ended on December 11, 1998. The Parkses failed to redeem, and the tax deed was awarded to Artman on December 21, 1998. Once again, Artman did nothing to notify the Parkses of this event, but she falsely verified in state court that she had given notice of her acquisition of the deed to the Parkses through personal service.

On Saturday, January 30, 1999, Artman appeared at the Parkses' residence and claimed that she owned the property. On Monday, the Parkses notified Norwest, which immediately put two researchers on the job to find out what could be going on. Their investigation revealed at last that the second 1994 tax payment had been returned and that Norwest had contacted the county in December 1995 after it failed to hear from the Parkses. According to Norwest's notes, the county informed them that the "first half [was] also paid by customer." Norwest thought that the county must have meant the second half; had that been so, it was understandable that Norwest's payment was returned, because it would have been duplicative. The county, however, meant what it said. It was Artman who had made the *second* payment, not the Parkses. Norwest's tax department also discovered the February 1996 "take notice" letter from Artman that had been misrouted and never sent to the tax department. At that point, Norwest retained counsel to fight the execution of the tax deed.

On February 4, 1999, the Parkses filed an emergency motion to stay execution of the tax deed judgment in state

court. The next day the court stayed the order of possession and gave leave to Norwest to intervene. Norwest and the Parkses moved to vacate the tax deed on the basis that Artman had fraudulently procured the deed by lying about the notice. The court agreed and vacated the deed judgment, finding that Artman had committed "actual fraud" in falsely swearing in her petition that she had caused the sheriff to make personal service on "parties residing in the county," when she did not.

Norwest redeemed the taxes and the tax deed was vacated in August 1999. Five months later, the court issued an order stating that it "vacate[d] and extinguish[ed] all right, title, interest, claim or demand, whatsoever that Kathy Artman may have acquired" in the Parkses' property. The Parkses also negotiated an agreement with Artman whereby she paid part of the Parkses' legal expenses. Unsatisfied, the Parkses then brought the present lawsuit against Norwest. The breach of contract and breach of fiduciary duty claims were tried to a jury, which found for the Parkses on January 14, 2003. The jury awarded the Parkses $4,000 in compensatory damages, $150,000 in emotional distress damages, and $3 million in punitive damages. The Illinois Consumer Fraud Act claim was tried to the court, which found in favor of the Parkses on March 31, 2003, awarding damages, attorneys' fees, and costs. Norwest moved for a new trial, or in the alternative, for remittitur of the punitive damages. The district court denied the new trial but did reduce the punitive damages to $820,000. Norwest's appeal covers everything except its liability for the $4,000 in compensatory damages.

## II

### A

We consider first Norwest's challenge to the emotional damage component of the jury's verdict in the breach of contract and breach of fiduciary part of the case. Illinois, whose law applies to this case, does not ordinarily allow punitive and emotional distress damages for breaches of contract. See *Morrow v. L.A. Goldschmidt Assocs., Inc.*, 492 N.E.2d 181, 183-84 (Ill. 1986) (holding that a plaintiff must prove an independent tort to recover exemplary damages). "[D]amages for breach will not be given as compensation for mental suffering, except where the breach was wanton or reckless and caused bodily harm, or where defendant had reason to know, when the contract was made, that its breach would cause mental suffering for reasons other than mere pecuniary loss." *Maere v. Churchill*, 452 N.E.2d 694, 697 (Ill. App. Ct. 1983). Even in cases where plaintiffs have sued builders and contractors over construction defects in their homes, courts have refused to award punitive damages unless the conduct causing the breach is also a tort. *Morrow*, 492 N.E.2d at 184. The breach must amount "'to an independent tort and there [must be] proper allegations of malice, wantonness or oppression.'" *Id.* (quoting *Bank of Lincolnwood v. Comdisco, Inc.*, 444 N.E.2d 657, 662 (Ill. App. Ct. 1986)).

The Parkses claim that because they stood to lose their home if the taxes were not paid correctly, that emotional damages are appropriate. But this is merely to say that the damages from this breach of contract are particularly serious, not that the case presents something more than a contractual issue. There is no evidence in the record that Norwest failed to pay the Parkses' taxes out of malice or wantonness or oppression. See *id.* Norwest made three mistakes. First, it failed to investigate the return of the second installment of property taxes in 1995,

which led to Artman's purchase of the taxes. Second, it failed to route the "take notice" form that Artman sent in 1995 to the correct department. Third, it failed properly to investigate the return of the 1997 taxes in 1998. On the other hand, once Norwest became aware that Artman had been issued a tax deed, it acted quickly to protect its interest (and that of the Parkses) in the property. The Parkses provided no evidence that Norwest's failures to act appropriately were purposefully done to harm the Parkses.

Although Norwest's missteps did put at risk the Parkses' ownership of their home, the kind of emotional disturbance they suffered falls outside the ambit of contract law. We have no doubt that anyone would suffer emotional harm from losing his or her home, or even from facing such a possibility. But that loss is, in contractual terms, a consequential harm from Norwest's failure to perform the duty it undertook in its agreement with the Parkses. Norwest promised to do one specific thing: to pay the property taxes associated with the mortgaged parcel(s). Its failure to perform that undertaking cannot give rise to anything more than liability for the direct consequences of its omission. See, *e.g.*, *Hanumadass v. Coffield, Ungaretti & Harris*, 724 N.E.2d 14, 18 (Ill. App. Ct. 1999) (holding that a lawyer-client relationship does not give rise to a duty to protect the client's emotional well-being). For example, if an employer fires an employee, in breach of an employment contract, no doubt the employee experiences some emotional harm from the firing. But the employer is liable for no more than the damages that flow directly from the breach, normally salary or other compensation. Put differently, absent fraud or malice, contractual damages are measured ordinarily by the value of the promise; they do not, like tort damages, attempt to restore the party to the *status quo ante*. Compare Oliver Wendell Holmes, *The Path of the Law*, 10 HARV.L.REV. 457, 462 (1897) ("The duty to keep a

contract at common law means a prediction that you must pay damages if you do not keep it—and nothing else.") with W. Keeton, *et al.*, PROSSER AND KEETON ON THE LAW OF TORTS § 2 at 7 (5th Ed. 1984) ("the civil action for a tort . . . is commenced and maintained by the injured person, and its primary purpose is to compensate for the damage suffered, at the expense of the wrongdoer."). The existence of a contract limits the damages; both parties know from the start the possible extent of their liability. In tort, in contrast, the person causing injury takes the victim as she finds her, and sometimes that can mean large damages. Here, Norwest's duty was contractual—to pay the Parkses' property taxes on time, and to account to the Parkses for the money spent. Without more, the breach of that duty does not support emotional damages.

B

Next, we consider Norwest's challenge to the award of punitive damages. We review the appropriateness of punitive damages *de novo. Lampley v. Onyx Acceptance Corp.*, 340 F.3d 478, 482 (7th Cir. 2003). We consider whether the evidence, when viewed in a light most favorable to the prevailing party, suffices to support the verdict. *Medcom Holding Co. v. Baxter Travenol Labs., Inc.*, 106 F.3d 1388, 1402 (7th Cir. 1997).

Illinois law disfavors punitive damages. See *Smith v. Prime Cable of Chicago*, 658 N.E.2d 1325, 1336 (Ill. App. Ct. 1995). They are recoverable only "where the alleged misconduct is outrageous either because the acts are done with malice or an evil motive or because they are performed with a reckless indifference toward the rights of others." *Id.* Ordinary negligence does not support an award of punitive damages. This means that the Parkses had to prove more than "mere inadvertence, mistake, [or] errors of judgment." *Loitz v. Remington Arms Co.*, 563 N.E.2d 397, 402 (Ill.

1990). They had to demonstrate that Norwest exhibited a "conscious and deliberate disregard" for their rights. *Burke v. 12 Rothschild's Liquor Mart, Inc.*, 593 N.E.2d 522, 531 (Ill. 1992).

The district court found that Norwest had not acted out of malice or with an evil motive, but that it had shown a reckless indifference towards the Parkses' rights. Norwest responds that it made three mistakes, which amounted to no more than simple negligence. Let us look again at the record. Norwest failed to investigate the return of the second installment of property taxes in 1995. The tax payment was returned because Norwest had made the payment to the old identification number. The return of a tax payment does not automatically signal a problem. Often, homeowners will also make a tax payment, even though they do not have to, and the payment made by the bank will be returned. Had this been a situation where both the Parkses and Norwest made the tax payment, Norwest's actions would have been appropriate. Unfortunately, however, this was not a situation where two payments were made; rather, no payment was made, leading to Artman's purchase of the taxes at a tax sale. Artman then sent Norwest a "take notice" form, alerting them that she had purchased the taxes. Artman, however, sent that form to the wrong Norwest office, and it was never routed to the appropriate department. Two years then passed without any indication of a problem until 1998 when a tax payment for 1997 was returned and Norwest again failed to investigate that refund.

Nothing in this scenario suggests that Norwest's actions amounted to "such gross negligence as to indicate a wanton disregard of the rights of others." *Loitz*, 563 N.E.2d at 402. Perhaps most important, the interests of the Parkses and Norwest were aligned. Norwest had given the Parkses a mortgage on their property, secured by the property itself. If the Parkses were to lose their house to Artman, Norwest

would lose its security. Any reckless indifference Norwest exhibited towards the Parkses would have been equally detrimental to its own ability to rely on the property as security for the repayment of the mortgage.

One of the purposes of punitive damages is to punish a defendant who might otherwise find that its behavior was cost-effective. See A. Mitchell Polinsky & Steven Shavell, *Punitive Damages: An Economic Analysis*, 111 HARV. L. REV. 869, 887 (1998) ("[I]f a defendant can sometimes escape liability for the harm for which he is responsible, the proper magnitude of damages is the harm the defendant has caused, multiplied by a factor reflecting the probability of his escaping liability."). As we have just noted, Norwest stood to lose as much as the Parkses by its handling of the taxes. The risk of losing its security interest provided an ample incentive to Norwest to put measures in place to prevent this type of occurrence. Indeed, Norwest had a system in place. Granted, the system failed in this particular case, but that failure does not mean that punishment is appropriate. As soon as Norwest learned of the problem, it set out to make matters right, and it succeeded in doing so in relatively short order. Its liability to the Parkses must be limited to the amount of actual damages caused, and so we hold that the award of punitive damages must be vacated.

## C

Finally, we turn to the Parkses' entitlement to recover under the CFA. To state a violation of the CFA, the plaintiffs must prove three elements: (1) an unfair or deceptive act or practice by the defendant; (2) the defendant's intent that plaintiff rely on the deception; and (3) the occurrence of the deception in the course of conduct involving trade or commerce. *Siegel v. Levy Org. Dev. Co., Inc.*, 607 N.E.2d 194, 198 (Ill. 1992). The district court found that although

the mistakes made by Norwest were not intentional, nevertheless its conduct in the face of the three mistakes "rose to the level of misconduct that is actionable under the CFA." We review the district court's interpretation of the law *de novo*. *Cerros v. Steel Tech., Inc.*, 288 F.3d 1040, 1044 (7th Cir. 2002).

The district court found that Norwest's failure to inform the Parkses about the true state of their taxes was a material omission, and that Norwest intended for the Parkses to rely on the tax statement. Although true to a point, it is unclear what sort of "reliance" Norwest intended. Surely Norwest intended that the Parkses rely on the statement as a true statement of their escrow account, but Norwest did not intend for the Parkses to fail to pay their taxes. In this case, the Parkses' reliance on the misstatements meant both that they could lose their home and Norwest could lose its security. Although in some circumstances innocent misrepresentations may form the basis of a CFA claim, we can find no Illinois case that extends the law to a situation like this one, in which a failure to disclose information inflicted as much injury on the defendant as on anyone else. There was no benefit that could flow to Norwest as a result of its failure to detect the tax payment mix-up, and so we find that the available evidence fails to support a claim under the CFA.

### III

We realize that, for a brief time, the Parkses must have been seriously worried about the prospect of losing their home as a result of Norwest's errors. Nonetheless, Norwest's actions were not the sort that can support emotional or punitive damages, nor can they form the basis of a claim under the CFA. We therefore VACATE the award of emotional distress and punitive damages and REVERSE the district court's finding of liability under the CFA.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*