2024 IL App (1st) 240315-U

SECOND DIVISION
December 24, 2024

No. 1-24-0315

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| TAMMY REESE, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 L 5068 |
| | ) | |
| CONAGRA FOODS, INC., CONAGRA BRANDS, INC., | ) | |
| | ) | |
| | ) | |
| Defendants-Appellants | ) | |
| | ) | |
| (DS CONTAINERS, INC., and FULL-FILL INDUSTRIES LLC, | ) | |
| | ) | Honorable |
| | ) | Janet Adams Brosnahan, |
| Defendants). | ) | Judge Presiding. |

_____

JUSTICE HOWSE delivered the judgment of the court.
Justices McBride and Ellis concurred in the judgment.

ORDER

¶ 1    *Held*:   We affirm the judgment of the circuit court of Cook County denying defendants' motion for judgment notwithstanding the verdict on the jury's verdict in favor of plaintiff on claims of strict product liability, negligence, and willful and wanton conduct; the evidence does not so overwhelmingly favor defendants that no verdict in favor of plaintiff could stand.

¶ 2    Plaintiff, Tammy Reese, filed a multi-count complaint against defendants, Conagra

Foods, Inc., Conagra Brands, Inc. (defendants), DS Containers, Inc., and Full-Fill Industries,

LLC to recover damages plaintiff suffered when an aerosol can of cooking spray vented its

contents which then ignited causing a fireball that engulfed plaintiff. Plaintiff settled her claims against DS Containers and Full-Fill Industries and neither entity is a party to this appeal. Following a trial, a jury returned a verdict in favor of plaintiff and against defendants, and awarded compensatory and punitive damages totaling $7 million. Defendants filed a posttrial motion for judgment notwithstanding the verdict (j.*n.o.v.*), which the trial court denied. For the following reasons, we affirm.

¶ 3                                BACKGROUND

¶ 4      Plaintiff suffered serious injuries when a can of cooking spray designed, manufactured, and sold by defendants caused a fire in a commercial kitchen where plaintiff was cooking. Plaintiff used the brand of cooking spray at issue in this case for cooking every day for the 13 years she worked in that kitchen. Defendants sold the cooking spray in a can which, according to the complaint, "was designed and manufactured with u-shaped vents on the domed bottom of the canister that were designed to open when the can buckled or when the bottom of the canister became convex instead of concave" due to becoming over-pressurized. The can at issue would vent its contents when the pressure inside the can exceeded 180 pounds per square inch (psi). The opening of the u-shaped vents would release the contents of the can and reduce the pressure. The contents of the can would reach 180 psi if the can reached a temperature of 165 degrees Fahrenheit. The can contained cooking oil and a hydrocarbon propellant. The propellant was flammable. Defendants began using this can design in 2011 and used it for this product until 2019. Plaintiff's accident occurred in 2017.

¶ 5      During kitchen operations plaintiff kept a can of the cooking spray on a metal shelf above a stove and oven while she cooked. The oven vented at the back of the metal shelf. The can of cooking spray had never felt hot when plaintiff used it from the shelf. On the date of plaintiff's

injury, plaintiff had been cooking for approximately 3 hours on a six-burner stove using three of the burners on a medium heat and the oven. During that entire time, a can of defendants' cooking spray sat on the shelf above the stove. Plaintiff heard a "swoosh," the can of cooking spray hit her in the face, and plaintiff caught fire. There is no dispute that the can of cooking spray above the stove vented its contents, which ignited, causing a fire that severely injured plaintiff.

¶ 6     The operative complaint (plaintiff's second amended complaint) stated claims against defendants for strict products liability—design defect; strict liability—manufacturing defect; strict products liability—failure to warn; strict liability—non-specific defect; negligence; and willful and wanton conduct. Finally, plaintiff claimed defendants engaged in willful and wanton conduct "in designing, testing, manufacturing distributing, marketing, promoting, and selling" the bottom-vented cooking spray can. Plaintiff claimed that defendants' conduct was willful and wanton in part because defendants allegedly placed profits over safety, ignored complaints, failed to conduct any meaningful investigation or testing, selected a bottom-vented can with no appreciable benefit with higher risks, failed to inform consumers of the risks and concealed those risks, continued to use the can when complaints began to be reported, designed, manufactured, filled, marketed, and sold the cooking spray can knowing its risks, that incidents had occurred, and conducted no testing concerning those incidents or to inform consumers of them, and failed to act to reduce the risks defendants allegedly knew of with the vented can. Plaintiff claimed that defendants knew of the danger associated with the manner and circumstances of plaintiff's foreseeable use of the bottom-vented cooking spray can "which danger would not be obvious to the general public."

¶ 7     At the trial, Michael Tarkanian, an engineer specializing in material science, metallurgy, failure analysis and manufacturing and design, testified that defendants' bottom-vented can was

unreasonably dangerous in a cooking environment because it "is just too weak to perform its function in a normal cooking environment" and "it contains a flammable gas as propellant, and that's especially a problem when you put that propellant in a can that's too weak to serve its purpose." Tarkanian testified that defendants' bottom-vented can "cannot contain the pressures that you would expect a can to be able to experience and survive in a cooking environment." The bottom-vented can was unreasonably dangerous because it was designed to release its flammable contents in an uncontrolled manner in a cooking environment at lower pressures than non-vented cans. The vents on the bottom of the can weaken the can which lowers the pressure at which the can will vent its contents. Tarkanian testified that defendants used non-vented cans for other cooking spray products that can withstand higher pressures than the bottom-vented can.

¶ 8    Tarkanian testified that a pressure tolerance of 180 psi is not enough for a normal cooking environment because a can with that tolerance could only withstand temperatures of 165°. Tarkanian did not know the actual temperature the can at issue reached. Aerosol cans without pressure-relief vents have a higher pressure tolerance. Tarkanian opined defendants' can was unreasonably dangerous because defendants used a flammable propellant when non-flammable propellants were available and used by defendants in other products. Tarkanian did not know if carbon dioxide was a suitable propellant for a can as large as the can at issue. Bulent Binbuga, one of defendants' scientists, testified that carbon dioxide could not be used as a propellant in a 16-ounce can. The can at issue in this case was a 16-ounce can.

¶ 9    Tarkanian testified that he conducted a risk-benefit analysis of the bottom-vented can. He explained that a risk-benefit analysis is "an understanding of all of the risks that can occur with a process or a product and balancing those risks against whatever you believe the benefits of that product or process are." He stated, "you think about what are the bad outcomes, what are the

dangers *** and you think about the severity of those risks ***." He concluded that in this case "there is a huge amount of severe risk and not any clear benefit." When asked whether the fact a non-vented can could explode was a benefit of the bottom-vented can, Tarkanian testified he was not aware of any non-vented cans ever over-pressurizing and exploding, "so that's a benefit that to me isn't a real benefit." Tarkanian testified he did consider "whether the same or something similar that happened to [plaintiff] happened to other people even before her." Tarkanian learned of eight incidents between 2012, when this product came to market, and May 2017 where "the same or similar thing happened to someone else before it happened to [plaintiff.]" At that point, the trial court orally instructed the jury consistently with the following written instruction given to the jury at the end of the case:

> "You heard evidence concerning notice or reports of other alleged
>
> incidents of cans of cooking spray venting and releasing their contents in a
>
> cooking environment. Such evidence may be considered solely as it relates to
>
> [plaintiff's] allegation that [defendants] possessed knowledge of the allegedly
>
> unreasonably dangerous defect in the product prior to her incident. It should not
>
> be considered for any other purpose. It is not evidence that the reports themselves
>
> are accurate or that the product is unsafe or unreasonably dangerous."

¶ 10    Tarkanian testified defendants received those reports. The reports described incidents of bottom-vented cans using the same propellant used in this case being used in kitchens and venting their contents which then ignited. Tarkanian testified he did not see anywhere that defendants performed a failure analysis or a root cause analysis of any of the incidents. He explained that a root cause analysis is an attempt to understand the underlying reasons for a failure. Tarkanian described defendants' investigation of one of the events as "just sort of an

overview of the event and that the aerosol cans performed the way it was designed" according to specifications. Tarkanian opined that defendants should have been concerned about the safety of their product upon receiving these reports. During that same time period defendants sold over 100 million cans of cooking spray in bottom-vented cans and plaintiff had used defendants' cooking spray thousands of times.

¶ 11     Michael Schulz, a fire and explosion investigator and analyst, testified that the fire originated from the can of cooking spray sitting on the metal shelf above the oven. Schulz testified that the can of cooking spray heated up, causing the pressure in the can to increase beyond the pressure the can could withstand, and this caused the vents to open and expel the contents of the can. The fire was a "diffuse fuel-vapor ignition," which means that the fuel source for the fire was vaporized and mixed with the air to create a flammable vapor cloud that ignited. The flammable contents of the can vented into the air and created a flammable vapor cloud. The vapor cloud ignited from the open flames of the stove and caused an explosion. Schulz testified that if defendants had used a non-vented can for the cooking spray at issue, the fire would not have occurred because the kitchen would not have reached the temperatures required for a non-vented can to release its contents (explode). Nor would the accident have occurred if defendants used a non-flammable propellant. Schulz testified that to reach 270 psi and burst, the non-vented can would have to be heated to a temperature of 250º to 260º.

¶ 12     Schulz agreed that all aerosol cans have inherent risks whether they are vented or not. This incident could only have occurred if sufficient heat acted on the can to cause the can to over-pressurize. A temperature of 165-170º was required to cause the can to pressurize over its pressure tolerance. The vented contents of the can could only ignite if the can was in proximity to an open flame. Schulz conceded that the pressure-relief vents were a safety feature designed to

keep the can from exploding if overheated. Schulz agreed that the metal shelf was not a safe place to keep any aerosol can. The fire would not have occurred if the can had not been kept on the shelf above the oven.

¶ 13    Kay Cooksey testified as an expert in packaging. Cooksey agreed that all aerosol cans carry some risk but opined that a carbon dioxide propellant would be safer than a hydrocarbon propellant. However, Cooksey was not aware of any 16-ounce aerosol cans that used a carbon dioxide propellant. Cooksey testified concerning venting the contents of an aerosol can from the bottom versus a non-vented can that might burst. Cooksey testified that "to have a flammable propellant released out the bottom towards a flame versus one that will misform, have a rocker bottom, possibly also start releasing product through the top is a lot less dangerous than one that's going to spray right towards an open flame."

¶ 14    Cynthia Rando testified as a "human factors" expert. Rando testified she was not aware of any testing defendants performed on the risk of a vented can using a flammable propellant. Rando did not know what such testing would show and conceded such testing might show that a bottom-vented can was appropriate for sale.

¶ 15    The label on the can warned users not to store the can at a temperature higher than 120º. Before the accident, plaintiff read the warnings on the can. The label on the can read,

"CAUTION. FLAMMABLE SPRAY. CONTENTS UNDER PRESSURE.

READ BACK PANEL CAREFULLY." The back panel read:

"Directions for Use:

Do not use near stoves, oven, sparks or flames. Hold can about 10

inches away from surface to be coated and spray a light coating

over entire surface. DO NOT overspray. Use adequate ventilation.

Can sprays best at room temperature of 68º-75ºF.

WARNING**:** FLAMMABLE SPRAY. DO NOT SPRAY ON HEATED

SURFACES OR NEAR OPEN FLAME. NEVER SPRAY DIRECTLY INTO

OVEN. REMOVE BROILER PANS FROM OVEN BEFORE SPRAYING. CAN

MAY BURST IF LEFT ON STOVE OR HEAT SOURCE. AVOID SPRAYING

IN EYES. USE IN ADEQUATE VENTILATION. USE ONLY AS DIRECTED.

CONTENTS UNDER PRESSURE. DO NOT PUNCTURE OR INCINERATE.

DO NOT STORE ABOVE 120ºF."

¶ 16    Rando opined the warnings on the can were not adequate. The warning does state the bottom-vented cans are able to burst, but "the terms under which it could burst are not clear." She also noted that the can of cooking spray in this case was not left on a stove or heat source. Regarding the warning not to store the can above 120º Rando opined that if defendants considered that a critical factor to protect consumers "there should have been some way for the user to know when this can was being exposed to 120 degrees Fahrenheit." She added, "there are simple solutions out there such as a little thermometer sticker that could have been put on there that *** senses heat gradient changes *** to give the user some sort of visual indication that there's something wrong." Rando testified there was no indication that defendants performed any testing on the language of the warnings.

¶ 17    Plaintiff testified she had read the warnings and directions on the can. Plaintiff understood the can would explode if it became overheated. Plaintiff did not know that defendants changed the design of the can or that the new can was "weaker" than non-vented cans. Plaintiff did not know the bottom-vented can was designed to release flammable propellants from the

bottom of the can if it reached a temperature of 165º. Plaintiff did not think the can of cooking spray ever reached a temperature of 120º on the metal shelf. Plaintiff testified that had she known of the dangers associated with the bottom-vented can or that the can should not have been kept on the metal shelf she would not have placed the can there and would have moved it further away from a heat source. If the can warned that it was "weaker" than non-vented cans, she would not have used that product.

¶ 18     A state fire investigator[1] testified for defendants that when a non-vented can becomes over-pressurized it might explode "like a bomb" and create shrapnel. The vents release the pressure to prevent the can from exploding. The investigator testified that the vents in the can in this case performed as expected and prevented the can from exploding.

¶ 19     Adam Tabor, a packaging engineer for defendants, testified by deposition that the change in the can resulted in a stronger and more sustainable can. Defendants projected a cost savings from the new can but those savings did not materialize. Defendants sold smaller cans of cooking spray in non-vented cans. Defendants stopped using the bottom-vented cans to unify the design for all of its cooking spray products. Tabor testified that one of defendants' non-vented cans it used for cooking spray products will buckle at an internal pressure of 218 psi and will only burst and release its contents at a pressure of 270 psi. Plaintiff also adduced evidence that defendants used cans that could withstand even higher pressures—one that would buckle at 261 psi and burst at 313 psi.

¶ 20     Diane Boesenberg is a regulatory affairs specialist specializing in consumer goods. Boesenberg testified that the warnings on the can at issue complied with federal law. The federal

---

[1]     This incident occurred in Pennsylvania but was tried in Illinois, where defendants are headquartered.

Food and Drug Administration has approved the use of hydrocarbon propellants. Federal law does not require a temperature gauge on aerosol products and Boesenberg has never seen one.

¶ 21    Dr. Nathan Dorris testified for defendants as a "human factors" consultant. Dorris opined the warnings on the cooking spray are appropriate and customary. The warnings communicate the nature of the hazard and how to avoid it.

¶ 22    Dr. Sean Dee testified as a fire origin and cause expert for defendants. Dee agreed the fire resulted from the can becoming overheated. Dee testified he performed testing and determined that the can of cooking spray in this case must have reached a temperature of at least 165º and likely close to 180º for the pressure in the can to exceed 180 psi and activate the vents.

¶ 23    Following the trial, defendants moved for a directed verdict. The trial court denied the motion as to plaintiff's claims for design defect, failure to warn, non-specific defect, and negligence. The court reserved ruling on the claim of willful and wanton conduct and stated it would submit the matter to the jury. The jury returned a verdict in favor of plaintiff and against defendants on plaintiff's claims for strict liability—design defect, strict liability—failure to warn, negligence, and willful and wanton conduct. The jury found in favor of defendants and against plaintiff on plaintiff's claim for strict liability—non-specific defect. The jury found plaintiff 30% at fault for her injuries and awarded plaintiff a total of $7.1 million including $4 million in punitive damages.

¶ 24    Defense counsel stated its desire to modify its motion for a directed verdict on which the trial court reserved ruling into a motion for j.*n.o.v*. The trial court withheld entering judgment on the jury's verdict until it ruled on the motion for j.*n.o.v*. The trial court entered a written order denying defendants' motion for j.*n.o.v*. and entered judgment.

¶ 25    This appeal followed.

¶ 26                                    ANALYSIS

¶ 27    This is an appeal from a judgment denying a posttrial motion for j.*n.o.v.* in a product liability case. "To recover in a product liability action, plaintiff must prove that the injury resulted from a condition of the product, that the condition was unreasonably dangerous, and that the unreasonably dangerous condition existed at the time the product left defendant's control." *Collins v. Interroyal Corp.*, 126 Ill. App. 3d 244, 253 (1984).

"A *** JNOV should be granted only when all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors [a] movant that no contrary verdict based on that evidence could ever stand. [Citations.]

In other words, a motion for [JNOV] presents a question of law as to whether, when all of the evidence is considered, together with all reasonable inferences from it in its aspect most favorable to the plaintiffs, there is a total failure or lack of evidence to prove any necessary element of the [plaintiff's] case. [Citations.]

In ruling on such a motion, a court does not weigh the evidence, nor is it concerned with the credibility of the witnesses; rather it may only consider the evidence, and any inferences therefrom, in the light most favorable to the party resisting the motion. [Citation.] The standard for entry of JNOV is a high one, and JNOV is not appropriate if reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented. [Citations.]

* * *

[A] reviewing court may not usurp the role of the jury and substitute its own judgment on factual questions fairly submitted, tried, and determined from evidence which did not overwhelmingly favor either position. [Citation.] Our standard of review from the appeal of a *** JNOV is *de novo*." *4220 Kildare, LLC v. Regent Insurance Co.*, 2020 IL App (1st) 181840, ¶¶ 26-27.

¶ 28                                DESIGN DEFECT

¶ 29    We first address defendants' argument that they are entitled to j.*n.o.v.* on plaintiff's strict liability—design defect claim. "In Illinois, two tests are employed when determining whether a product is unreasonably dangerous under a strict liability design-defect theory—the consumer-expectation test and the risk-utility test." *Calles v. Scripto-Tokai Corp.*, 224 Ill. 2d 247, 250 (2007). We note defendants' arguments are focused only on the risk-utility test.

"Under the risk-utility test, a plaintiff may prevail in a strict liability design-defect case if he or she demonstrates that the magnitude of the danger outweighs the utility of the product, as designed. [Citation.] Stated differently, '[t]he utility of the design must therefore be weighed against the risk of harm created' and '[i]f the likelihood and gravity of the harm outweigh the benefits and utilities of the product, the product is unreasonably dangerous.' [Citation.]" *Calles*, 224 Ill. 2d at 259. [2]

¶ 30    There are numerous factors the court and jury may consider when applying the risk-utility test. *Id*. at 263. The *Calles* court expressly warned that the factors it listed for courts to

_____

[2]    The strict liability—design defect count claimed the bottom-vented can of cooking spray was unreasonably dangerous. The jury instructions defined "unreasonably dangerous" to mean "that the risk of danger inherent in the design outweighs the benefits of the design when the product is put to a use that is reasonably foreseeable considering the nature and function of the product."

consider when applying the risk-utility test was not exclusive. *Id*. at 266. "The factors cited merely illustrate those that may assist a court and jury in evaluating whether a design is unreasonably dangerous." *Id*. It is "up to the fact finder to determine the importance of any particular factor, and its 'relevance, and the relevance of other factors, will vary from case to case.' [Citation.]" *Id*.

¶ 31    The factors the court identified in *Calles* were:

1.      The availability and feasibility of alternate designs at the time of manufacture;

2.      That the design used did not conform with the design standards of the industry, design guidelines provided by an authoritative voluntary association, or design criteria set by legislation or governmental regulation;

3.      The usefulness and desirability of the product—its utility to the user and to the public as a whole;

4.      The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury;

5.      The availability of a substitute product which would meet the same need and not be as unsafe;

6.      The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility;

7.      The user's ability to avoid danger by the exercise of care in the use of the product;

8.      The user's anticipated awareness of the dangers inherent in the product because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions;

9.      The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance;

10.     The appearance and aesthetic attractiveness of the product;

11.     Its utility for multiple uses;

12.     The convenience and extent of its use, especially in light of the period of time it could be used without harm resulting from the product; and

13.     The collateral safety of a feature other than the one that harmed the plaintiff. *Calles*, 224 Ill. 2d at 263-66 (citing *Anderson v. Hyster Co.,* 74 Ill. 2d 364, 368 (1979), J. Wade, *On The Nature of Strict Tort Liability for Products,* 44 Miss. L.J. 825, 837-38 (1973), American Law of Products Liability 3d § 28:19, at 28-30 through 28-31 (1997)).

¶ 32     Defendants argue that the evidence "overwhelmingly favored" defendants on each of the relevant factors identified in *Calles*. The specific factors defendants argue overwhelmingly favor judgment in their favor are factors 3 through 8 and 11 through 13 listed above.

¶ 33     Defendants argue that all aerosol cans have safety risks. Plaintiff should not have kept the cooking spray on the metal shelf above the oven and no aerosol can (regardless of design) should have been kept on the shelf. The cooking spray warned that it should not be placed near a heat source. Defendants argue that plaintiff testified that she understood the warnings, and had plaintiff followed the warnings, the accident would not have occurred. Despite evidence that an alternative design could have been safer, the bottom-vented can "presents no risk of fire if the warnings on the can are followed by the user." The reports of prior incidents involving the bottom-vented can and the absence of reports of incidents involving non-vented cans is not evidence that another design was safer or that the bottom-vented can carried an unreasonable likelihood of serious injury because the jury was instructed that the evidence of prior reports of

incidents involving bottom-vented cans was admitted only to establish that defendants received them and not that they actually occurred as reported or that defendants' can was unsafe.

¶ 34    Defendants further argue that the evidence that a can with a higher pressure resistance would have prevented the accident is speculative because there was no evidence of what the temperature reached on the shelf where the can that caused the injury was kept; and, there was evidence that all aerosol cans of cooking spray have a risk of causing a fire and there was evidence that no aerosol can should have been kept on the shelf. There was no evidence defendants could have designed or manufactured an aerosol can of cooking spray that eliminated the known risks inherent in all aerosol cooking spray products because all aerosol cans of cooking spray, regardless of their design, have some risk of causing a fire or bursting.

¶ 35    Plaintiff argues that the trial included evidence that an alternative design, *i.e.*, a standard-bottom, non-vented can, has a higher pressure tolerance and uses non-flammable propellants which supports a finding that the risks associated with the bottom-vented can outweigh its benefits. We agree with plaintiff.

¶ 36    A plaintiff may "demonstrate that a product is unreasonably dangerous because of a design defect by presenting evidence of an alternative design that would have prevented the injury and was feasible in terms of cost, practicality and technological possibility." *Hansen v. Baxter Healthcare Corp.*, 198 Ill. 2d 420, 436 (2002). We find that there was not a "total failure of evidence" to prove the risk of harm from the bottom-vented can (*4220 Kildare, LLC*, 2020 IL App (1st) 181840, ¶¶ 26-27) and the jury's determination that the risk outweighed its benefits is not against the manifest weight of the evidence (*Hansen*, 198 Ill. 2d at 439 (holding defective-design theory was properly submitted to a jury and the verdict does not contradict the manifest weight of the evidence)).

¶ 37     We find that any evidence that the accident would not have occurred if the warnings had been followed and the cooking spray was not kept on the shelf does not tip the weight of all of the evidence viewed in a light most favorable to plaintiff overwhelmingly in defendants' favor. First, regarding plaintiff's placement of the cooking spray on the metal shelf, "[m]isuse of a product is using it for a purpose neither intended *nor reasonably foreseeable* by the defendant based upon an objective standard." *Varilek v. Mitchell Engineering Co.*, 200 Ill. App. 3d 649, 666 (1990). The jury heard evidence that plaintiff used the product as intended and/or in a manner that was reasonably foreseeable. The product was intended and defendants designed the product in a manner that reflected its expectation that the product would be used in cooking, in a kitchen environment, in some degree of proximity to a heat source. Tabor, principal packaging engineer for defendants, testified that the purpose of the bottom vents was

> "for our food service or these larger sizes that would be used in environments like
> that where we suspected that there's more chance of thermal abuse. So cooking on
> a flat-top griddle and you set it on the edge of the griddle very near the heat
> source, those are designed that if it's thermally abused and the pressure is elevated
> inside the container, that it would vent the contents in a controlled manner rather
> than bursting."

¶ 38     We find that the jury could find that it was intended or foreseeable that a user would use the cooking spray in a manner similar to plaintiff's use of the cooking spray. Therefore, we find that this evidence does not overwhelmingly favor judgment in defendants' favor.

¶ 39     Second, a product bearing an adequate warning is not in a defective condition, nor is it unreasonably dangerous. *Salerno v. Innovative Surveillance Technology, Inc.*, 402 Ill. App. 3d

490, 499 (2010) (citing *Genaust v. Illinois Power Co.,* 62 Ill. 2d 456, 467 (1976), citing Restatement (Second) of Torts § 402A, Comment *j,* at 353 (1965)). However,

"[a] jury may determine that warnings are not adequate if those warnings: (1) do not specify the risk presented by the product; (2) are inconsistent with how a product would be used; (3) do not provide the reason for the warnings; or (4) do not reach foreseeable users." *Sollami v. Eaton*, 201 Ill. 2d 1, 19 (2002) (Harrison, J., dissenting).

It "is a 'well-established legal princip[le] that the trier of fact *** is free to accept or reject testimony and give whatever weight it deems appropriate to the evidence submitted.' [Citation.]" *McGinley Partners, LLC v. Royalty Properties, LLC*, 2021 IL App (1st) 200390, ¶ 75.

¶ 40 The jury could find that the warnings failed to specify the risk or provide the reason for the warning. The can warned that the can may burst if it were left "on" a stove or heat source then separately warned not to "store" the can above 120º. The jury could find the label failed to warn the user the can could "burst" (or in this instance vent) if it reached a temperature of 165º. The jury heard evidence that the warning not to use the product "near" a heat source was vague as to how far from a heat source the can could be used. A user could construe the warnings to mean the can would only burst if directly in contact with a heat source, which did not occur in this case. The jury could also find the warnings were inconsistent with how the product would be used. The jury heard evidence that a user would not know when the cooking spray reached 120º. The jury also heard testimony that if that condition was important for users' safety defendants could have done more to alert users. Plaintiff testified that had there been something on the can indicating it was approaching 120º she would have moved the cooking spray from the metal

shelf. We find that the evidence presented was sufficient to permit the jury to find that the warnings were not sufficient to prevent this incident and that finding is not against the manifest weight of the evidence. Therefore, this fact does not overwhelmingly favor defendants.

¶ 41     We also find that the jury did not have to rely on reports of prior incidents involving the bottom-vented can and the absence of reports of incidents involving non-vented cans to find that the bottom-vented can carried an unreasonable likelihood of serious injury or that another design was safer. We note at the outset that we find no evidence the jury violated the trial court's limiting instruction on the use of reports of incidents involving the bottom-vented can. Plaintiff's evidence included Tarkanian's testimony that defendants' can was too weak and would vent under conditions that could be expected in a normal cooking environment. Tarkanian testified that alternative can designs were available that would withstand higher pressures that would not be reached in a normal cooking environment unless the can was placed in the oven or on a burner. Tarkanian opined that the flammability of the propellant and the weakness of the can created a high amount of risk without any clear benefit.

¶ 42     Dr. Kay Cooksey testified defendants could have used a non-flammable propellant and there was no reason not to. Cooksey opined alternative designs were safer because defendants' bottom-vented can was unreasonably dangerous because it would vent its contents from the bottom, likely in the direction of an open flame, whereas other can designs would vent from the top (burst), away from any potential open flames. Michael Schulz opined that a differently designed can, with a higher pressure tolerance, kept on the shelf, would not have reached the temperatures required for a non-vented can to release its contents. None of this evidence relies upon the prior incidents involving the same or similar cans of cooking spray.

¶ 43    Defendants rely on testimony that other, non-flammable propellants would not work in the size can used for defendants' cooking spray. The jury could consider whether a substitute product would meet the same need with the ability to eliminate the unsafe character of the product without impairing its usefulness. Defendant has not directed this court to any evidence that it was necessary or useful to sell the product in this size can. Regardless, assuming there was some need or that a larger can of cooking spray has some usefulness to commercial users like plaintiff, the jury could find numerous other factors outweighed those considerations including the likelihood that the product would cause injury and the probable seriousness of the injury. *Calles*, 224 Ill. 2d at 266 ("it is up to the fact finder to determine the importance of any particular factor, and its relevance, and the relevance of other factors, will vary from case to case"). The finding that the evidence establishes that a safer alternative design existed without sacrificing utility is not against the manifest weight of the evidence and does not overwhelmingly favor defendants.

¶ 44    Nor do we find that the evidence that a safer alternative design was available was speculative. The can at issue was designed to vent its contents, which it did, at a temperature of 165°. There was unequivocal evidence that a non-vented can would not burst at a temperature of 165°. The actual temperature on the shelf is irrelevant to the determination of whether a safer design was available because the shelf was not a direct heat source and could not have reached the temperatures required for a non-vented can to burst. It is also not speculative that a non-flammable propellant would have been safer. Tarkanian testified that it was the propellant that ignited, not the cooking oil, and that the cooking oil itself would not ignite under these circumstances. Furthermore, the jury heard evidence that the risk "inherent in all aerosol cooking spray products," that the aerosol can could explode if overheated, had never actually occurred.

We cannot say that the fact that all aerosol cans carry some risk overwhelmingly favors defendants where the jury could reasonably find the risk inherent in all aerosol cans was practically nonexistent.

¶ 45    Defendants cite *Jablonski v. Ford Motor Co.*, 2011 IL 110096, ¶ 103, and *Kokoyachuk v. Aeroquip Corp.*, 172 Ill. App. 3d 432 (1988), for the proposition that a plaintiff cannot establish that a product is unreasonably dangerous by showing the possibility of a safer alternative design, and the "availability of an alternative design does not translate into a legal duty in products liability." However, the availability and feasibility of alternate designs at the time of manufacture and the availability of a substitute product which would meet the same need and not be as unsafe are factors the *Calles* court identified that the jury may consider in the risk-utility test. Neither *Jablonski* nor *Kokoyachuk* alter the applicability of these factors.

¶ 46    *Kokoyachuk* is inapposite because that case applied the consumer expectation test, not the risk utility test. *Kokoyachuk* predates our supreme court's adoption of the risk-utility test by two years. See *Calles*, 224 Ill. 2d at 255 ("this court in *Lamkin v. Towner,* 138 Ill. 2d 510, 528 (1990), adopted a second, alternative test for design defect cases known as the risk-utility, or risk-benefit, test."). We find that *Kokoyachuk* has no application in this case. In *Jablonski*, the court wrote that the "[p]laintiffs must show more than the technical possibility of an alternative design." *Jablonski*, 2011 IL 110096, ¶ 103. However, by this statement, the court did not mean that evidence of an alternative design is not relevant in the risk-utility analysis. The court's statement about "the technical possibility of an alternative design" was in reference to the fact that not every alternative design changes the risk-utility balance in favor of the plaintiff, as was the case with the fuel tank at issue in *Jablonski*. The court noted that,

"It is not sufficient that the alternative design would have reduced or

prevented the harm suffered by the plaintiff if it would also introduce into the

product other dangers of equal or greater magnitude." (Internal quotation marks

omitted.) *Id*. ¶ 102 (quoting Restatement (Third) of Torts: Products Liability § 2,

cmt. f, at 23 (1998)).

¶ 47    In *Jablonski*, the alternative design would have required the manufacturer to "completely redesign the vehicle, and would have introduced other risks of equal or greater magnitude." *Id*. ¶ 101. Thus, under the facts of that case, the alternative design did not support finding that the defendant's design was unreasonably dangerous. *Id*. ¶¶ 107.

¶ 48    In this case, the alternative design would not have required defendants to completely redesign the product. Defendants were already using non-vented cans for other cooking spray products. The alternative design would not have introduced any other dangers, least of all any dangers of equal or greater magnitude than the bottom-vented can. The jury also heard evidence that there was no real benefit to the bottom-vented can. In this case, based on the risks involved and the availability and feasibility of safer alternative designs, the jury could find that the risks inherent in the product design outweighed the benefits and, therefore, that the can of cooking spray at issue was unreasonably dangerous.

¶ 49    In further reply defendants merely attempt to reweigh evidence defendants find favorable to them. Defendants' arguments go to the weight the jury assigned to the pertinent considerations in the risk-utility analysis, the evidence it chose to accept or reject, and the weight accorded the evidence it did accept. This court will not "usurp the role of the jury and substitute its own judgment on factual questions fairly submitted, tried, and determined from evidence which did not overwhelmingly favor either position." *4220 Kildare, LLC*, 2020 IL App (1st) 181840, ¶¶ 26-

27. The evidence on which defendants rely does not overwhelmingly favor their position. Rather, significant evidence supported plaintiff's position. The judgment in this case required the jury to assess the credibility of the witnesses and to make determinations regarding conflicting evidence; therefore, defendants are not entitled to j.*n.o.v*. *Binkowski v. International Health Systems, Inc.*, 2024 IL App (1st) 221557, ¶ 66 ("JNOV may not be entered if there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome.").

¶ 50                                    FAILURE TO WARN

¶ 51     Defendants argue they are entitled to j.*n.o.v*. on plaintiff's failure to warn claim because plaintiff failed to adduce any evidence of causation. Defendants argue there is no evidence plaintiff would have acted differently if the warnings on the can had been different. Defendants claim that plaintiff's expert could offer no evidence that different warnings would have prevented plaintiff's injuries. "A plaintiff must prove that the alleged defect in the product was an actual cause of the injuries rather than a mere condition." *Kleen v. Homak Manufacturing Co., Inc.*, 321 Ill. App. 3d 639, 643 (2001). "In the warning cases, it has been held that there must be sufficient evidence supporting a reasonable inference, rather than a guess, that the presence of adequate warnings would have prevented the plaintiff's injuries." *Broussard v. Houdaille Industries, Inc.*, 183 Ill. App. 3d 739, 744 (1989).

¶ 52     Defendants argue that their warnings complied with federal requirements. We agree that "design criteria set by legislative or governmental regulation" is relevant in the risk-utility test. *Calles*, 224 Ill. 2d at 263-64. However, this court has held,

- 22 -

"If a manufacturer is found to have an obligation to warn of the dangerous propensities of its product, it follows that whatever warnings are given must be sufficient in form, content, and intensity to advise a reasonable person of the danger so that she can exercise caution in the use of the product commensurate with the potential danger. [Citation.] *** As stated earlier, compliance with Federal regulations is relevant to the issue of whether a product is unreasonably dangerous, but it is not determinative of the question." *Martin v. Ortho Pharmaceuticals*, 268 Ill. App. 3d 980, 986–87 (1994), reversed on other grounds, *Martin v. Ortho Pharmaceutical Corp.*, 169 Ill. 2d 234 (1996).

¶ 53    The jury's verdict reflects that it did not consider defendants' compliance with federal labeling regulations dispositive of the failure to warn claim. The jury could reasonably infer from the evidence, not just guess, that the warnings were inadequate and that adequate warnings could have prevented plaintiff's injuries. The record refutes defendants' argument there is "no evidence" different warnings would have prevented the accident.

¶ 54    Plaintiff testified she read the warnings but did not know the can used flammable propellants, did not know the can was designed to release flammable propellants if it reached a temperature of 165°, and that she did not know what could possibly happen to the can if it was stored over 120°. The former manager of plaintiff's workplace testified that after learning what could happen with the can of cooking spray he changed practices in the kitchen to keep the cans further from the stove and oven. Plaintiff agreed that if the shelf was over 120° keeping the cooking spray there would be a violation of the warning; but plaintiff also testified it would have been helpful if there was something on the can that told her it was approaching 120°. Plaintiff testified that if such a device was on the can and she saw it approaching 120°, she would have

removed the can from the shelf. On the day of the incident, plaintiff testified, she had no way of knowing how hot the can was getting. Plaintiff testified that the can was never hot to the touch. Plaintiff testified that "flammable" in the warnings meant that "[i]f you sprayed it towards an open flame, it would catch fire," not that if the can reached a certain temperature it would release a flammable vapor cloud into the cooking environment. Plaintiff understood the warning that the can should not be left on a heat source but she testified that the shelf was not a heat source. Plaintiff did not understand the warning about not using the cooking spray near stoves, ovens, or open flames to mean the ambient temperature in the cooking environment and not just the actual burners or in the oven. Despite defendants' claim that Rando did not provide evidence that a temperature indicator was feasible, the jury did hear Rando testify that such solutions were "out there." When asked if plaintiff understood that the can should not be kept near heat, Rando testified that "it's degrees of heat, that's the problem." Rando testified that plaintiff did not understand what it meant that the can was not supposed to be kept "near" heat.

¶ 55     The jury was free to accept Rando's testimony over contradictory evidence. The jury could find that the warnings did not explain what "near" meant. The jury could also consider evidence that, even though the oven vented at the back of the shelf, the shelf did not generate heat, and plaintiff did not consider the shelf a "heat source," and therefore the warnings were inadequate. Based on all of the evidence viewed in a light most favorable to plaintiff, the jury could find that the warnings did not advise plaintiff of the danger so that she could exercise caution in the use of the product commensurate with the potential danger, and that "the presence of adequate warnings would have prevented the plaintiff's injuries." *Broussard*, 183 Ill. App. 3d at 744. Therefore, j.*n.o.v.* is not appropriate on this claim.

¶ 56                         WILLFUL AND WANTON CONDUCT

¶ 57    Finally, defendants argue "the evidence cited by the [trial court] does not justify the *** denial of [defendant's] motion for [j.*n.o.v.*] on the *** claim of willful and wanton conduct. Nor did [plaintiff] offer any other sufficient evidence of willful and wanton conduct that the [trial court] neglected to mention in its order denying [defendants'] post-trial motion."

¶ 58    "The essential elements of wilful and wanton conduct in a product liability case include knowledge of the defect, knowledge or notice that the defect was likely to cause injury and failure to warn of or remedy a known defect or take some other affirmative action to avoid the injury." *Collins*, 126 Ill. App. 3d at 256 (citing *Moore v. Jewel Tea Co.*, 116 Ill. App. 2d 109 (1970)). Therefore, the question for this court is whether, viewing the evidence in a light most favorable to plaintiff, there is any evidence to support plaintiff's claim defendants knew the cooking spray can was unreasonably dangerous, knew the defect was likely to cause injury, and failed to warn of or to remedy the defect or to take action to avoid the injury. *Id.*, see also *Kopczick v. Hobart Corp.*, 308 Ill. App. 3d 967, 973-74 (1999). "Prior similar occurrences are admissible for the purpose of establishing knowledge on the part of a manufacturer that a defect in the product existed prior to the injuries in the litigated case." *Moore v. Remington Arms Co., Inc.*, 100 Ill. App. 3d 1102, 1110-11 (1981) (*Moore*). "The purpose of the admission of prior occurrences to establish punitive damages in products liability cases is to show that the manufacturer had or should have had knowledge of harm inflicted on consumers by its product and with flagrant indifference to public safety failed to warn consumers of or remedy the defect." *Moore*, 100 Ill. App. 3d at 1112. Knowledge of "the potential dangerousness of their product, coupled with the notice to them of prior claims *** present[s] a question for the jury to determine whether the defendants were guilty of wanton and wilful conduct." *Jewel Tea Co.*, 116 Ill. App. 2d at 136-37.

¶ 59    Defendants first argue that "as a matter of law" because cooking spray cans "carry inherent safety risks," the relatively small number of reports of adverse incidents it received was not enough to put defendants on notice of a possible defect in the cooking spray can or the warnings on the can, especially where there was no evidence the reports were true. Defendants also argue there was no "other evidence" to support a verdict that defendants engaged in willful and wanton conduct. In support of their argument, defendants rely in part on a decision by our supreme court and two decisions that followed it: *Loitz v. Remington Arms Co.*, 138 Ill. 2d 404 (1990), *Hobart Corp.*, 308 Ill. App. 3d 967, and *Bachman v. General Motors Corp.*, 332 Ill. App. 3d 760 (2002).

¶ 60    The plaintiff in *Loitz v. Remington Arms Co.* (*Remington*) suffered injuries when the barrel of the shotgun he was using exploded. *Remington*, 138 Ill. 2d at 407. The "most significant evidence" the plaintiff adduced of the defendant's alleged knowledge of the defect was evidence "concerning the number of prior accidents reported to Remington." *Id*. at 418. The defendant presented evidence that it investigated "each of *** 94 prior similar occurrences" (although it was not "clear from the record precisely what sort of investigation was performed") and concluded that the cause of the explosion in every case was the shotgun shell used in the gun, not the shotgun itself. *Id*. at 419. Our supreme court held that in the case of a dangerous instrumentality, the mere occurrence of other incidents, without more, "does not establish misconduct or some other basis to warrant the imposition of punitive damages." *Id*. at 419. The *Remington* court quoted favorably from a commentator's discussion of "the relevance of evidence of prior accidents" as follows:

     " 'It is also important to view the number of complaints and lawsuits

          concerning a product in the context of the total number of products sold and in

use, the frequency of the product's use, and the particular product's inherent dangers. Thus, it must be expected that virtually all manufacturers of mass-produced goods that are inherently dangerous—automobiles, tires, drugs, chemicals, or firearms—will be the targets of many complaints and lawsuits every year.' [Citation.]" *Remington*, 138 Ill. 2d at 420 (quoting Owen, *Problems in Assessing Punitive Damages Against Manufacturers of Defective Products*, 49 U. Chi. L. Rev. 1, 31 (1982)).

¶ 61    Applying that rationale, our supreme court found that "the prior explosions represent a small percentage of Remington's production of gun barrels [(0.003%)], and an even smaller percentage of the number of times the shotguns were actually fired." *Id.* at 420. Our supreme court held that "there was not sufficient proof that Remington had the requisite degree of culpability that would warrant imposition of a sanction that is intended to punish and deter." *Id.*

¶ 62    Similarly, in *Hobart Corp.* (*Hobart*) the appellate court concluded that "the notice of prior accidents in this case does not approach the magnitude and character necessary to conclude that [the] defendant was unable to maintain a good faith belief in the safety of its product." *Hobart*, 308 Ill. App. 3d at 974. In *Hobart*, the allegedly defective product was a meat saw with a "slant" design. *Id.* at 969-71. The alleged defect was the tendency of the "slant saw" to "self-feed," which could cause "the operator to sustain injury when his hands are drawn into the blade along with the meat." *Id.* at 970. The evidence at trial included "documents showing that, prior to plaintiff's injury, [the] defendant had received notice of 30 incidents in which meatcutters had claimed to have been injured as a result of the [slant saw's] tendency to self-feed." *Id.* at 971. The *Hobart* court examined *Remington* and found that our supreme court found certain factors "important" (not decisive) to the determination of the "probative value of notice of prior

substantially similar occurrences (SSOs) for purposes of assessing the propriety of *** punitive damages." *Id*. Those factors are "(1) the ratio of prior SSOs to the total number of products sold and the number of products in use; (2) the ratio of SSOs to the frequency of the product's use; and (3) the particular product's inherent dangers." *Id*. (citing *Remington,* 138 Ill. 2d at 419-20).

¶ 63    The *Hobart* court found that the prior occurrences represented a "meager" percentage of the slant saws sold and the number of cuts made with the slant saw. *Id*. at 975. The court held that "[s]uch meager percentages (0.5% of the number of saw's produced and 0.0000007% of the estimated number of cuts made with those saws) do not put a manufacturer of a mass-produced and inherently dangerous product on notice that its product has an unreasonably dangerous defect. This is particularly so when, as in this case, the claimed injuries arise from a risk that inheres in the product's intended use." *Id*. The court found that the specific risk asserted in that case, that the operator of the saw might have their fingers severed, was "a danger associated with any meat saw, regardless of its design." *Id*.

¶ 64    Lastly, in *General Motors Corp.*, 332 Ill. App. 3d 760 (*General Motors*), the plaintiffs argued that the trial court erred in denying the plaintiffs' motion to amend their complaint to add a claim for punitive damages. *Id*. at 804. The *General Motors* court agreed with the trial court's finding that the percentage of prior incidents of which the defendants received notice was "meager" (approximately 0.008% of total vehicle production and an "infinitesimal" percentage of miles driven by those vehicles) and could not have put the defendants on notice that the vehicles at issue had a defect that would result in the risk of harm at issue in that case ("the inadvertent deployment of the vehicle's air bag in circumstances similar to the incident"). *Id*. at 806.

¶ 65    Although defendants refute the contention their argument relies on a "bright line rule," we note that *Remington* does not stand for the proposition that a percentage of incidents lower than the percentage of incidents in *Remington* is insufficient to provide notice of a potential defect "as a matter of law." Rather, the *Remington* court engaged in a comprehensive overview of all of the evidence of the defendant's alleged awareness of the product defect to conclude the defendant had no such knowledge or did not act with "the requisite degree of culpability" in rejecting evidence of a defect. *Id*. at 427. Just as in *Remington*, the *Hobart* court did not find that a threshold ratio of incidents to products sold and used exists to provide notice of a defect to a manufacturer. The court held that, "[a]fter a thorough review of the record, we hold that the scant evidence of [the] defendant's pre-injury knowledge of defect, and whatever highly speculative inferences the jury might have drawn from such evidence, were insufficient to have put the question of punitive damages to the jury." *Hobart*, 308 Ill. App. 3d at 978. Finally, the *General Motors* court applied the "percentage of prior incidents" test to the plaintiff's claim for punitive damages but it did not, as required by *Remington* and *Hobart*, discuss whether the product at issue was "inherently dangerous," whether the prior incidents involved precisely the same risk of harm alleged in the case before it, or discuss any other evidence of the defendants' knowledge of the alleged defect.

¶ 66    We reject defendants' argument the prior incidents in this case did not put defendants on notice of any alleged unreasonably dangerous condition of the bottom-vented can "as a matter of law." Prior incidents involving the same defect that is before the jury can be "probative" of the defendant's awareness of the alleged defect. The authorities on which defendants rely stand for the propositions that (1) if a product is "inherently dangerous" a small number of incidents involving the product, without clear evidence the prior incidents involve the specific defect

alleged, do not by themselves give a defendant notice of the potential defect, but in any event (2) the court must analyze all of the evidence concerning a defendant's knowledge in proper context to determine whether a defendant was on notice of the defect alleged. *Remington*, 138 Ill. 2d at 419 (citing *Moore*, 100 Ill. App. 3d at 1112,, *Hobart*, 308 Ill. App. 3d at 975).

¶ 67    Next, defendants argue that all aerosol products carry an inherent safety risk of bursting at a certain pressure point and a risk of fire, "no matter how they are designed and no matter how warnings are phrased," and, "[f]or that reason, *** a handful of reports of other incidents *** did not put [defendants] on notice that there was a particular defect associated with that particular can design or with associated warnings." We reject defendants' contention that due to the "inherent danger" involved with all aerosol cans a small number of complaints about this can would not provide defendants awareness their product may be unreasonably dangerous. *Remington* instructs that the number of complaints must be viewed in the context of "the particular product's inherent dangers." *Remington*, 138 Ill. 2d at 419 (quoting Owen, *Problems in Assessing Punitive Damages Against Manufacturers of Defective Products,* 49 U. Chi. L. Rev. 1, 31 (1982)). *Hobart* also instructs that the court should examine the manufacturer's knowledge in terms of the specific risk alleged not just general risks associated with the product. *Hobart*, 308 Ill. App. 3d at 976. Defendants' attempt to analogize the gun barrels at issue in *Remington* with all aerosol spray cans is unpersuasive when considered in context of the alleged defect in the products in relationship to the inherent risks involved with the products. In *Remington*, the alleged defect was the use of a certain type of steel to manufacture the barrel of the shotguns at issue which would make them prone to explode with normal use. *Remington*, 138 Ill. 2d at 409-10. In that case there was evidence that shotgun barrels could explode for several reasons; and in fact the defendant's investigation of each prior incident attributed the explosion to one of those

potential other causes. *Remington*, 138 Ill. 2d at 411. Because there was evidence that the barrels could explode for reasons unrelated to the product itself, and the defendant demonstrated a good faith belief that in the reported incidents the cause was not the shotgun, the court concluded that the small number of prior incidents did not put the manufacturer on notice the product was defective. *Id*. at 419-21.

¶ 68       Although there was evidence that any aerosol can could over-pressurize and explode, the inherent danger of defendants' can of cooking spray is not just that it just might overheat, over-pressurize, and explode; the danger alleged for this particular product was that it would overheat *with normal use*, has a *lower pressure tolerance* than other aerosol cans, and, if over-pressurized, would *vent its flammable contents* in the direction of an expected heat source that could cause the contents to ignite. These are unique risks. See *Hobart*, 308 Ill. App. 3d at 976. Unlike the gun barrels in *Remington*, there is no evidence anything could cause the specific risk involved in this case other than the design of this can. The risk that an aerosol can will vent its contents in a normal cooking environment when used in a foreseeable manner and release a flammable vapor cloud of chemical propellant in the direction of an ignition source is not a danger associated with any aerosol can, regardless of its design. *Hobart*, 308 Ill. App. 3d at 975. Viewed in this context, even a small number of incidents were sufficient to provide defendants with notice that the cooking spray was unreasonably dangerous.

¶ 69       We recognize that the jury was instructed not to consider the prior incidents as evidence defendants' product was defective; however, the jury was permitted to consider the prior incidents as evidence of defendants' knowledge of the prior incidents. Regardless, the jury was presented with independent evidence sufficient for the jury to find that defendants knew the can was unreasonably dangerous. Defendants designed the cooking spray can and knew the

temperature at which it would vent its contents and should have known that temperature could be achieved in the normal cooking environments in which defendants intended the product to be used. Defendants knew that if that happened, it was likely to cause serious injury based on what is released (a flammable gas cloud) and where and how it is released (toward a heat source in an environment where open flames would be expected). The jury could consider the reports of prior incidents as *additional* evidence of defendants' knowledge of the defect without violating the limiting instruction. Defendants' knowledge of the potential dangerousness of the product "coupled with the notice to them of prior claims" was sufficient to raise a question for the jury to determine whether defendants were guilty of willful and wanton conduct. *Jewel Tea Co.*, 116 Ill. App. 2d at 136-37. The jury could find that "after knowledge of impending danger, [defendants' failure] *** to prevent it or [to] discover the danger *** when it could have been discovered by the exercise of ordinary care" was a reckless disregard for the safety of others. See *Ziarko v. Soo Line Railroad Co.*, 161 Ill. 2d 267, 273 (1994), *Collins*, 126 Ill. App. 3d at 256.

¶ 70    Defendants argue that the trial court erred in finding that plaintiff's willful and wanton conduct claim was supported by evidence other than the eight prior incidents involving defendants' cooking spray. For the reasons demonstrated above, we reject defendants' argument that no other evidence other than the eight prior incidents support finding that defendants were willful and wanton. We also find that the small number of incidents does not relieve defendants of knowledge of the defect as a matter of law; and, furthermore, in light of the unique risks involved, the prior similar incidents were competent evidence of defendants' knowledge of the unreasonably dangerous condition of their product. Unlike *Hobart*, the specific risks here are not inherent in aerosol cooking sprays—as evidenced by the fact that there is no evidence of aerosol cooking spray in non-vented cans ever "exploding." *Hobart*, 308 Ill. App. 3d at 975 ("Such

meager percentages do not put a manufacturer of a mass-produced and inherently dangerous product on notice that its product has an unreasonably dangerous defect. This is particularly so when, as in this case, the claimed injuries arise from a risk that inheres in the product's intended use.").

¶ 71    Defendants complain of the trial court's reliance on specific evidence to support the jury's verdict. As to each piece of evidence, we reject defendants' contention that the jury could not base its judgment that defendants were willful and wanton at least in part on the evidence presented. Defendants designed the can at issue and sold other cooking sprays in non-vented cans. The cooking spray at issue in this case vented, by design, at a temperature (165°) at which a non-vented can would not have burst. The jury could find that defendants knew that because the bottom-vented can of cooking spray had a lower pressure tolerance than a non-vented can, it would vent its contents in cooking environments in which a non-vented can would not burst. The jury also heard testimony that the cooking spray can had a high risk of harm with no real utility, safer alternatively designed cans were available and feasible for defendants' use, and an alternatively designed can would have prevented plaintiff's injury. The jury could also find that defendants knew of the unreasonably dangerous condition of the cooking spray and that it was likely to cause injury because defendants knew the propellant in the can was highly flammable and would vent in the direction of heat or open flames when the product was used as defendants intended or foresaw.

¶ 72    The jury could find that defendants took no affirmative actions to avoid the injury. *Collins*, 126 Ill. App. 3d at 256 (citing *Jewel Tea Co.*, 116 Ill. App. 2d 109 ("The essential elements of wilful and wanton conduct in a product liability case include knowledge of the defect, knowledge or notice that the defect was likely to cause injury and failure to warn of or

remedy a known defect or take some other affirmative action to avoid the injury.")). The jury could accept the testimony that defendants' investigation into the prior incidents was inadequate and only concluded that the cans performed as intended. The jury would not violate the trial court's instructions by considering defendants' failure to conduct adequate testing in light of the reports of incidents involving similar cans of cooking spray to be willful and wanton. We reject defendants' argument this is the equivalent of using the prior reports as evidence the product was unreasonably dangerous. That argument would only have resonance if there were no other evidence the product was unreasonably dangerous other than the prior reports—*e.g.*, if there were no testimony that the product was dangerous (and why) with no real utility, no testimony that the warnings were ineffective (and why), and if there were no evidence that a safer alternative design that was feasible for use without sacrificing utility was available.

¶ 73     Furthermore, the jury, having found a defect, was not precluded, as a matter of law, from finding notice of the defect, just because the number of reports was "miniscule." Nor did the trial court instruct the jury that it could not consider defendants' reaction (or lack thereof) to its "knowledge of the allegedly unreasonably dangerous defect" as evidence of defendants' reckless disregard for the safety of others, especially in light of the determination that the product was, in fact, unreasonably dangerous. *Pendowski v. Patent Scaffolding Co.*, 89 Ill. App. 3d 484, 487 (1980) ("Failure, after knowing that there is impending danger, to exercise ordinary care to prevent it, or failure to discover danger through recklessness or carelessness when it could have been discovered by the exercise of ordinary care, constitutes wilful and wanton conduct."). Nothing in the trial court's instruction precludes the jury from considering all of the evidence as it relates to the issues it had to resolve. Therefore, the quality of defendants' investigation was a relevant consideration for the jury.

¶ 74    We find that regardless of whether defendants believed the bottom-venting can was a safety feature, the jury could find defendants knew that the product was unreasonably dangerous and that defendants were willful and wanton based on their response to the knowledge that their product was unreasonably dangerous. The jury could find that defendants acted with reckless disregard for safety (*Ziarko*, 161 Ill. 2d at 273) or at minimum, failed to act to reduce the risk (*Hobart*, 308 Ill. App. 3d at 974 ("In the context of a products liability claim, a manufacturer's awareness that its product is unreasonably dangerous coupled with a failure to act to reduce the risk amounts to willful and wanton conduct.")).

¶ 75    Furthermore, viewing the evidence in a light most favorable to plaintiff, the jury could reasonably find the warning labels were inadequate. Defendants argue that defendants cannot be found willful and wanton for failing to modify its warnings where there was no evidence that defendants knew modification of the warnings was necessary. Defendants argue the evidence failed to establish that defendants knew modification of the warnings was necessary because the only evidence was that defendants received reports of incidents involving the cooking spray—not that those incidents occurred or were the result of a failure to warn—and there was no evidence defendants knew different warnings would be more effective. The jury heard evidence that the warnings were not sufficient to warn plaintiff what it meant not to use the product "near" stoves, ovens, or flames or to keep the product "on" a "heat source," or how to know the product was approaching a temperature of 120º. We also find that defendants' compliance with federal law is not dispositive. The jury could find that the warnings on the can were inadequate based on evidence (discussed above) that does not overwhelmingly favor defendants.

¶ 76    Defendants' attempt to analogize *Remington* and *Hobart* on the basis that, as in those cases, defendants here did conduct an investigation into the reported incidents involving the

cooking spray but, as in *Remington* and *Hobart*, the investigation did not result in remedying the alleged defect. However, in this case, the jury could have found that defendants did not investigate in good faith based on the testimony criticizing the investigations. The jury could further find that defendants were willful and wanton in failing to modify their warnings because defendants knew their product was defective and had notice of incidents involving their defective product alleging uses contrary to what defendants purportedly believed the labels warned against—specifically allowing their bottom-vented can to exceed 165º. Regardless of whether defendants knew different warnings would be more effective defendants knew, should have known, or could have discovered that their current warnings were ineffective to prevent injury.

¶ 77    The trial court found that defendants were motived by financial considerations. We find that the jury was presented with ample evidence to support an award of punitive damages regardless of any alleged motive on the part of defendants. As demonstrated above, the evidence of whether defendants were willful and wanton does not overwhelmingly favor defendants.

¶ 78    Defendants also argue that the "purported superior safety of a different design is not sufficient evidence of willful and wanton conduct." We disagree. Plaintiff adduced independent evidence that defendants knew of the risk involved with bottom-vented cans and their utility, and defendants knew of the availability of another design that did not carry the same risk (or any risk that had ever occurred) and provided the same or similar utility. The jury did not have to interpret the prior incidents to mean the bottom-vented can was less safe than any other design. The jury could interpret the design specifications and other evidence to mean that the bottom-vented can was less safe than another design because it would release its contents at a lower temperature—one that may be expected in normal use—than a non-vented can without adding any utility. The availability and feasibility of the alternative design is sufficient evidence that the

product was unreasonably dangerous regardless of any extraneous notice to defendants. *Calles*, 224 Ill. 2d at 263 ("this court has held that a plaintiff may prove a design defect by presenting evidence of 'the availability and feasibility of alternate designs at the time of its manufacture' "). The jury was instructed that it could use the prior incidents as evidence that defendants "possessed knowledge of the *allegedly* unreasonably dangerous defect in the product prior to [plaintiff's] incident." (Emphasis added.) If the jury found the product was in fact defective based on independent evidence, nothing precluded the jury from reasonably inferring defendants knew of the unreasonably dangerous condition of their can of cooking spray. "It is only necessary that the conclusion arrived at by the jury be based on an inference that is reasonable under the facts, and a verdict is not to be set aside because the jury could have drawn different inferences." *Liberty Mutual Insurance Co. v. Williams Machine & Tool Co.*, 21 Ill. App. 3d 510, 519-20 (1974). The evidence of the prior incidents would still only be used "as it relates to [plaintiff's] allegation that [defendants] possessed knowledge of the allegedly unreasonably dangerous defect in the product." Knowledge of the unreasonably dangerous condition of their product and failing to take action to avoid injury is evidence of willful and wanton conduct. *Hobart*, 308 Ill. App. 3d at 974.

¶ 79    We find that the evidence pertaining to whether defendants were willful and wanton does not overwhelmingly favor defendants, and the jury's verdict awarding punitive damages is not against the manifest weight of the evidence. As previously explained, the evidence and reasonable inferences therefrom established that defendants had knowledge of the unreasonably dangerous condition (based on the availability and feasibility of alternative designs that would eliminate the risk and that defendants used those alternative designs for other products), knowledge or notice that this condition was likely to cause injury (based on knowledge that the

bottom-vented can could vent its contents with normal use, that the chemicals it vented were flammable, and that it would vent in the direction of an ignition source), and failed to warn or remedy the condition or take any affirmative action to prevent the injury (by conducting an inadequate inquiry into reports of issues with its bottom-vented cans and/or by continuing to use bottom-vented cans and failing to adequately warn consumers). *Collins*, 126 Ill. App. 3d at 256, *Hobart*, 308 Ill. App. 3d at 974 ("In the context of a products liability claim, a manufacturer's awareness that its product is unreasonably dangerous coupled with a failure to act to reduce the risk amounts to willful and wanton conduct."). Therefore, we find defendants are not entitled to j.*n.o.v.* on plaintiff's claim of willful and wanton conduct.

¶ 80   Finally, defendants argue they were also entitled to j.*n.o.v.* on plaintiff's negligence count essentially for the same reasons defendants argued they were entitled to j.*n.o.v.* on plaintiff's strict liability counts. For the same reasons stated herein, we reject this argument as well.

¶ 81                                CONCLUSION

¶ 82   For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 83   Affirmed.